860 F.2d 1317
 48 Fair Empl.Prac.Cas. 395,
48 Empl. Prac. Dec. P 38,398, 12 Fed.R.Serv.3d 994,
50 Ed. Law Rep. 32
 Kathryn J. GUTZWILLER, Plaintiff-Appellant, Cross-Appellee
(86-3852/86- 3854), Plaintiff-Appellee, (86-3916),
v.
Bernard C. FENIK; Getzel M. Cohen; Joseph Steger; Gisela
Walburg; Gerald Cadogan; Archie Christopherson; Michael
Sage; T.M. Bell; the University of Cincinnati; Paul W.
Christensen, Jr.; Dr. Charles M. Barrett; Walter E.
Bartlett; Rev. Dr. L. Venchael Booth; William J. Keating,
Jr.; Marjorie B. Parham; John H. Hermanies; Lyle
Everingham; Stanley M. Chesley; and Norman Baker,
Defendants-Appellees, (86-3852).
Appeal of Bernard C. FENIK and Getzel M. Cohen,
Defendants-Appellees, Cross-Appellants, (86-3852/86-3854).
Appeal of Joseph A. STEGER, Defendant-Appellant, (86-3916).
 Nos. 86-3852, 86-3854 and 86-3916.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 27, 1987.
Decided Nov. 1, 1988.
 
 Eric C. Holzapfel, argued, Wood & Lamping, Cincinnati, Ohio, for gutzwiller.
 Robert A. Pitcairn, Jr., argued, Katz, Teller, Brant & Hild, Cincinnati, Ohio, for Steger.
 Kenneth R. Faller, argued, Cincinnati, Ohio, Beckman, Weil, Shepardson, & Faller, for all other defendants-appellees.
 James B. Helmer, Jr., argued, Cincinnati, Ohio, Virginia Conlan Whitman, for Fenik and Cohen.
 Before JONES, WELLFORD and GUY, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Plaintiff, Kathryn Gutzwiller, brought this action against the University of Cincinnati ("the University" or "UC") and a number of individual defendants claiming, among other things, that defendants' decision to deny her a promotion with tenure in the University's Classics Department was the result of sex discrimination. Gutzwiller brought suit under 42 U.S.C. Sec. 1983 (1982) for alleged deprivations of equal protection and substantive due process, and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982), for discriminatory treatment in employment.
 
 
 2
 Gutzwiller's section 1983 claims proceeded to trial against seven of the individual defendants.[1] The jury found that two of these defendants, Getzel Cohen and Bernard Fenik, had intentionally discriminated against Gutzwiller thereby depriving her of equal protection. The jury further found that three of the defendants--Cohen, Fenik, and Joseph Steger--had not given Gutzwiller's tenure application "fair consideration" thereby denying her substantive due process of law. After a separate damages trial, the jury awarded compensatory and punitive damages consistent with the verdicts.
 
 
 3
 The trial court, holding that it was not bound by the jury's findings of liability on the section 1983 causes of action, dismissed the Title VII claim and denied Gutzwiller equitable relief, 645 F.Supp. 363. In addition, the court granted defendant Steger's post-trial motion for judgment notwithstanding the verdict ("JNOV") and set aside all punitive damages against defendants Fenik and Cohen. However, the court denied Fenik and Cohen's post-trial motions for a new trial on the issue of liability under section 1983.
 
 
 4
 For the reasons that follow, we affirm the district court's denial of a new trial as to Fenik and Cohen and affirm the grant of a JNOV as to Steger. However, we reverse the lower court's decision to set aside the award of punitive damages as to Fenik and Cohen. Moreover, we reverse the district court's dismissal of the Title VII claim and remand for a determination of the appropriate equitable relief.
 
 I.
 A.
 
 5
 The following facts were established at trial. Dr. Kathryn Gutzwiller was hired as an assistant professor in a tenure track position by the University of Cincinnati Department of Classics ("Department") effective September 1, 1978. Gutzwiller's employment with the University was governed by the collective bargaining agreements entered into between the University and the UC Chapter of the American Association of University Professors ("AAUP"). Gutzwiller's initial appointment was for a period of two years extending through August 31, 1980. Her initial two-year contract was renewed twice by the University, for a total appointment of six years. She was then reappointed for one additional year.
 
 
 6
 At the time Gutzwiller was hired, the Department consisted of twelve faculty members. At that time, Professor Kathryn Pearson, the only female member of the Department, was on tenure track but she was ultimately denied tenure in 1981. Until Professor Gisela Walberg, an archaeologist, obtained tenure in 1982, no woman had ever been tenured in the Department.
 
 
 7
 Gutzwiller's academic specialty is Classical Philology, which consists of the study of literature from the classical period and the use of language in that literature. While her primary area of specialization is Greek literature (which makes her a "Hellenist"), she has also taught graduate classes in Roman literature (which also makes her a "Latinist"). Professor Ann Michelini, another female professor in the Department who was hired at the same time as Gutzwiller, also specializes in Greek literature. According to Gutzwiller, at the time she and Michelini were hired, they were told by defendant Bernard Fenik, the head of the Department at that time, that they were on tenure track and would attain tenured positions if they met the Department's criteria.
 
 
 8
 Gutzwiller apparently performed very well in her position, as evidenced by her two reappointments and steady progression toward tenured status. Moreover, Gutzwiller received high marks for her teaching, participated in departmental matters, and wrote a book, based in part on her Ph.D. dissertation, which was accepted for publication. Nevertheless, in Gutzwiller's June 1981 year-end review, Fenik told Gutzwiller that a book based on her doctoral dissertation was insufficient and that it was important that she publish another book, "independent of the Ph.D. dissertation." J. App. at 1994. Fenik told Gutzwiller that this second book would be given "considerable weight [by him] in a decision on tenure." Id. At this time, Fenik also stated that the potential termination of Pearson would create an imbalance in the Department between Hellenists and Latinists and that this could result in Gutzwiller's termination. Gutzwiller expressed her opinion that any dismissal based on such an imbalance was improper under the collective bargaining agreement, and that she would oppose any attempt to dismiss her for such a reason. Id.
 
 
 9
 By the summer of 1981, defendant Getzel Cohen had replaced Fenik as Head of the Department. Because it was apparent from her discussion with Fenik that another book would be necessary in order for her to receive tenure, Gutzwiller wrote to Cohen in September of 1981 requesting leave for the 1982-83 academic year so that she could work on her new book. Gutzwiller's request consisted of one quarter of special duty assignment at full salary (to which she was entitled by virtue of having completed four years of full-time services at the University) and two quarters of professional leave without pay. Id. at 1996. Gutzwiller's request for professional leave was denied by Cohen. Moreover, her one-quarter of special duty assignment leave was not given until the third quarter of 1983, just prior to when she was to apply for promotion with tenure. According to Gutzwiller, this effectively precluded any possibility of completion of her second book prior to her tenure review.
 
 
 10
 In his 1982 year-end review of Gutzwiller, Cohen, like Fenik, made reference to the need for further publication, stating that "much will depend on further work produced by Professor Gutzwiller." Id. at 1997. Cohen also alluded to the imbalance in the Department and its likely role in future tenure decisions. According to Gutzwiller, as a result of the alleged imbalance between Latinists and Hellenists, she and Michelini were competing for a single tenured position in the Department. This was contrary to Fenik's representation to them at the time of their hirings and in violation of the AAUP agreement. When questioned by Michelini in the spring of 1983, Cohen confirmed that Michelini and Gutzwiller were indeed competing against each other and that only one of them would receive tenure. Id. at 737-40.
 
 
 11
 An assistant professor's candidacy for tenure and promotion to associate professorship status is normally considered during her sixth academic year, which in Gutzwiller's (and Michelini's) case was the 1983-84 academic year. Application is first made at the department level and is considered by both the Department Head (Cohen) and a departmental committee called the Reappointment, Promotion and Tenure Committee ("RPTC" or "Committee") The RPTC is made up of the five tenured faculty members of the Department other than the Department chairman.[2] The chairman of the Committee (who at the time was Fenik) and the Department Head each make a separate recommendation to the Dean of the College of Arts and Sciences. The Dean makes a recommendation to the University Provost who, in turn, makes a recommendation to the University President. Finally, the President makes a recommendation to the University Board of Trustees. The candidate's dossier is transmitted at each level of the process.
 
 
 12
 At the time Gutzwiller applied, tenure decisions within the Department were based upon three published criteria: teaching, scholarship and service to the Department. The emphasis on these factors was consistent with Article VI, p 5.A of the AAUP agreement which required that academic performance be the sole criterion for promotion decisions. Scholarship, as evidenced by the quality of a candidate's published works, was the factor upon which the Department placed primary importance. The Department's subjective assessment of a candidate's scholarship was assisted by evaluations obtained from a number of scholars outside the University. Generally, five outside evaluators were selected for each candidate. Because the quality of published work was such a significant factor in the tenure decision, the outside evaluations were a very important part of the process. Tenure candidates understandably wanted their work to be evaluated by scholars who were familiar with their particular academic specialty and who would give a fair and unbiased evaluation of their work.
 
 
 13
 Toward this end, the Department's procedures provided that each candidate was to submit a list of prospective outside scholars to the RPTC which then was to select at least three scholars from the candidate's list. The list that Gutzwiller submitted to Fenik included two German scholars since a number of her works had been published extensively in Europe. She also specifically requested that one scholar, Professor Giangrande, not be selected because of his reputation for consistently negative criticism. Fenik did not indicate any problem with Gutzwiller's selections. However, when Fenik made his selections, he chose only two from Gutzwiller's list and no foreign scholars were selected. Further, Giangrande was selected, as was his protege, Heather White. Fenik also selected Professor Karl Galinsky, his former colleague, who specialized in Latin literature.
 
 
 14
 Although Gutzwiller complained to Fenik about his failure to conform to the criteria for evaluator selection, Fenik did not change the selections. However, after Gutzwiller complained to the Dean of the College of Arts and Sciences, William Dember, Fenik was admonished to follow the published procedures. As a result, several of the scholars previously selected by Fenik were eliminated from the list and Fenik agreed to select a German scholar if Gutzwiller would allow Professor Galinsky to remain on the list. While Gutzwiller agreed to this, a German scholar was not ultimately able to be included because of time delays. In any event, Gutzwiller eventually did get four of the outside scholars she originally requested.
 
 
 15
 The RPTC reviewed Gutzwiller's tenure file, including the assessments of Gutzwiller's scholarship provided by the outside evaluators. Based on this review, the RPTC unanimously recommended against tenure. The recommendation against tenure was made in a letter from Fenik, the head of the RPTC, to Dean Dember. In his letter, Fenik made generally favorable comments about Gutzwiller's performance in the "teaching" and "service to the department" categories, but focused primarily on the Committee's conclusions about alleged deficiencies in Gutzwiller's scholarship. Although Fenik observed that the outside evaluators made some favorable comments about her published work, he concluded that the letters as a whole demonstrated that
 
 
 16
 the candidate's work is considered competent, lucid, in full control of pertinent bibliography, and thorough, but neither creative nor original, and not outstanding. Most references in this instance and others, are at pains to emphasize the positive, but there is a pattern of statements in the letters that sets a distinct limit to their recommendations. The lack of originality comes through clear.
 
 
 17
 J.App. at 2043. In his concluding paragraph, Fenik stated:
 
 
 18
 We also look to the future of the department, with its need for faculty of genuine distinction, and for another Latinist to counter the preponderance of specialists in Greek philology, and we recommend, unanimously, that Kathryn Gutzwiller not be promoted to the rank of associate professor and not be granted tenure.
 
 
 19
 Id. at 2046.
 
 
 20
 Consistent with the above-mentioned tenure procedures, an independent evaluation of the file was also made by Cohen, the Department chairman. Cohen recommended to Dean Dember that Gutzwiller not receive tenure, for reasons similar to those given by Fenik. Id. at 2049-51. Cohen also mentioned the need to remedy the departmental imbalance between Hellenists and Latinists.
 
 
 21
 Gutzwiller objected vehemently to the letters written by Fenik and Cohen. In response to these negative recommendations, she wrote several letters to Dean Dember and to the tenure file. In addition, she persuaded others, including Ann Michelini who had received a favorable recommendation from Cohen and Fenik, to write letters on her behalf. The letters written by Gutzwiller challenged the manner in which the outside evaluations were interpreted. She felt that Fenik and Cohen emphasized only the few negative points in what were very positive overall evaluations of her work. Id. at 2055-57. Gutzwiller also challenged the Department's reliance on "program needs" as being prohibited by the AAUP contract, which allowed only academic performance to be considered in promotion decisions. Id. at 2059-60. Further, Gutzwiller mentioned the procedural irregularities in the selection of her five outside evaluators. Id. at 2060-61. Finally, Gutzwiller's letters, as well as several of those submitted on her behalf, charged that the negative tenure recommendations were part of a pattern of action which was likely the result of sex discrimination. Id. at 2061, 2071, 2161-62.
 
 
 22
 Dean Dember considered these submissions, the original file, and the letters from Cohen and Fenik. On January 31, 1984, Dember concluded that Gutzwiller should be granted tenure. In his letter to Provost Joseph Steger recommending that Gutzwiller be granted tenure, Dember noted that Gutzwiller's teaching had been "excellent" and that, in the area of service, she had "done more than her share." Although Dember expressed some misgivings about Gutzwiller's failure to publish more works, he noted that the evaluations of her scholarship were "generally laudatory." After expressing his dismay with "the acrimony which has already tainted the decision making process in this case," Dember concluded that "a disinterested evaluation of [Gutzwiller's] credentials demands a positive recommendation. [She] has fulfilled the expectations of the Classics Department as they were enunciated when she was hired and as they are stated in the present RPT document." J.App. at 2075.
 
 
 23
 Dember's positive recommendation was sent along to Provost Steger. Before making his own decision, however, Steger requested more information on the Department's program needs. Id. at 2076. This information was provided by Cohen. Gutzwiller objected to Steger's consideration of departmental program needs and her attorney stressed the inappropriateness, under the AAUP contract, of considering this factor. On April 13, 1984, Steger notified Gutzwiller that he was "unable to recommend [her] promotion to Associate Professor with tenure," giving no reasons for his decision. Id. at 2088. Upon Gutzwiller's request for an explanation, Steger cited certain problems she had encountered with graduate students in 1980-81 and the concerns about her scholarship as expressed in Fenik and Cohen's letters. Id. at 2089-90. Subsequently, University President Henry Winkler adopted the negative recommendation of Provost Steger, and the Board of Trustees denied Gutzwiller tenure.
 
 
 24
 In response to her denial of tenure, Gutzwiller filed a grievance against the RPTC, Fenik, Cohen, and Steger pursuant to the AAUP contract. A hearing was held on May 31, 1984, and the grievance committee issued findings and recommendations which were presented to Steger who, in the interim, had been named President of the University. The grievance committee found, among other things, that (1) procedural irregularities occurred in the way in which documentation was compiled for Gutzwiller's dossier; (2) improper procedures were used to solicit outside reviewers to judge her scholarly publications; (3) the recommendations of Fenik and Cohen were influenced to some degree by "program needs" and not based solely on Gutzwiller's academic performance; and (4) there were questions whether the RPTC and the Department had presented impartial recommendations for Provost Steger's review. The grievance committee recommended that a new review of Gutzwiller's application for promotion with tenure be conducted and that, in the meantime, Gutzwiller be offered a one-year extension of her appointment. That review was to be performed by a new RPTC composed of some members of the Department and some persons from outside the Department. The grievance committee specifically recommended that Fenik not be included on the new RPTC.
 
 
 25
 Steger accepted most of the grievance committee's recommendations, but refused to accept the recommendation of a new review with an independent RPTC. Instead, he offered a new review with the same RPTC. Gutzwiller declined such a review at the hands of the same committee that had already denied her tenure. Instead, she filed this lawsuit in the United States District Court for the Southern District of Ohio.
 
 B.
 
 26
 Gutzwiller's suit named as defendants the University of Cincinnati, the five members of the RPTC (including the Committee chairman, Bernard Fenik), Getzel Cohen as chairman of the Department, Joseph Steger and various other individuals. While Cohen, Fenik and Steger are the only remaining defendants in this action, the University has filed a brief in this court because of its obligation to indemnify its employees.
 
 
 27
 Gutzwiller claimed that the defendants subjected her to intentional discrimination in employment because of her sex, and denied her substantive due process of law. She sought compensatory damages under 42 U.S.C. Sec. 1983 for deprivation of equal protection and denial of substantive due process, and sought injunctive relief in the form of reinstatement to her former position with tenure. In addition, Gutzwiller sought equitable relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq.
 
 
 28
 Gutzwiller's section 1983 claims were tried to a jury. Concurrently, her Title VII claim was tried to the court. The jury returned a verdict on July 3, 1986 finding that Fenik and Cohen intentionally discriminated against Gutzwiller and denied her substantive due process of law. While the jury did not find Steger liable for sex discrimination, the jury found that he denied Gutzwiller substantive due process of law. The jury found that the remaining defendants were not liable on any of Gutzwiller's claims. Following the liability phase of the jury trial, the jury heard testimony concerning damages. On July 11, 1986, the jury returned a verdict finding Cohen liable for $40,000 in compensatory damages and $38,000 in punitive damages. The jury found Fenik liable for $70,000 in compensatory damages and $50,000 in punitive damages and found Steger liable for $40,000 in compensatory damages and $40,000 in punitive damages. Thus, the total damage award was $278,000.
 
 
 29
 After the jury returned its liability verdict, but before damages were assessed, the trial judge, the Honorable Carl Rubin, informed the parties that he found for the defendants on the Title VII claim. J.App. at 1753-54. The judge explained that he viewed the case as a "damage case" and that if the parties wanted to discuss possible settlement of damages they were free to do so aided by the knowledge that no equitable relief would be forthcoming. Id. He also told the parties that he did not want the jury to be influenced by his decision on the Title VII claim and would delay formally issuing his decision until after the damages phase of the trial. Accordingly, on July 21, 1986, ten days after the damages verdict was returned, the court entered its decision dismissing Gutzwiller's Title VII claim and denying her equitable relief. Id. at 229-36. Gutzwiller's appeal challenges the court's dismissal of the Title VII claim and its refusal to grant equitable relief (back pay, reinstatement, or front pay) under Title VII and section 1983.
 
 
 30
 After the trial was completed, Steger filed a motion for JNOV or, in the alternative, for a new trial. In an order entered August 15, 1986, the court granted Steger's motion for JNOV. Id. at 259. Gutzwiller also challenges this decision.
 
 
 31
 Fenik and Cohen also filed a post-trial motion for a new trial. The court denied this motion, but construed it as a motion for JNOV and, accordingly, "remitted" all punitive damages against Fenik and Cohen on the basis of insufficient evidence to support such damages. Id. at 258. Gutzwiller appeals this decision, and Fenik and Cohen cross-appeal the denial of their motion for a new trial.
 
 II.
 
 32
 We first address Fenik and Cohen's assertion that the district court abused its discretion in denying their post-trial motion for a new trial on liability issues under section 1983. As to the equal protection claim, Fenik and Cohen argue that a new trial is required because the probative evidence does not support the jury's findings that they discriminated against Gutzwiller on the basis of her sex. Moreover, they assert that the evidence fails to demonstrate that their allegedly discriminatory actions were the cause of the denial of Gutzwiller's application for promotion with tenure. As to the substantive due process claim, Fenik and Cohen argue that they are entitled to either judgment in their favor or a new trial because the probative evidence was insufficient to create a jury question on this issue. Specifically, they argue that Gutzwiller did not have a substantive due process right to continued employment at UC and that, even if she did, the evidence did not establish that their actions were so arbitrary and capricious as to deprive her of that right. In addition, Fenik and Cohen argue that they are entitled to a new trial because the trial court committed reversible error in its instructions to the jury on both the equal protection and substantive due process claims. These arguments and some others, all of which we reject, will be dealt with in turn.
 
 A.
 
 33
 Both Title VII and section 1983 provide relief for discriminatory employment practices of public employers. Daniels v. Board of Education, 805 F.2d 203, 206-07 (6th Cir.1986). As this court has observed several times, the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983. See, e.g., Kitchen v. Chippewa Valley Schools, 825 F.2d 1004, 1011 (6th Cir.1987); Daniels, 805 F.2d at 207; Grano v. Department of Development, 637 F.2d 1073, 1081-82 (6th Cir.1980). Under both statutes, the plaintiff must establish by a preponderance of the evidence that she was the victim of intentional or purposeful discrimination. Kitchen, 825 F.2d at 1011; Daniels, 805 F.2d at 207. A plaintiff cannot meet this burden by simply introducing evidence of discriminatory intent and suggesting that such intent could have played a role in an adverse employment decision. Rather, a plaintiff is required to demonstrate that the adverse employment decision would not have been made "but for" her sex. Put differently, the plaintiff must show that the " 'discriminatory intent more likely than not was the basis of the adverse employment action.' " Goostree v. State of Tennessee, 796 F.2d 854, 863 (6th Cir.1986), cert. denied sub nom. Goostree v. Montgomery County Quarterly Court, 480 U.S. 918, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987) (quoting Blalock v. Metals Trades, Inc., 775 F.2d 703, 709 (6th Cir.1985)).
 
 
 34
 After a careful review of the record, we believe there was sufficient evidence from which a jury could find that Fenik and Cohen intentionally discriminated against Gutzwiller and that their discriminatory actions were the cause of her denial of promotion with tenure. Accordingly, we conclude that the trial court did not abuse its discretion on this issue.
 
 
 35
 In our view, the jury could have found from the evidence that Fenik intentionally treated Gutzwiller less favorably throughout the evaluation process than he treated men; that he put barriers in her path that were not encountered by men seeking tenure in the Department; that he imposed higher standards of scholarship upon Gutzwiller than upon similarly situated men; and that he intentionally engaged in a calculated effort over time to insure that Gutzwiller did not receive tenure. Gutzwiller's evidence disclosed numerous instances from which Fenik's discriminatory intent could be inferred. One such instance was Fenik's statement to Gutzwiller that she would need to publish an additional book independent of her dissertation and that this book would be given considerable weight in her tenure decision. While Fenik attempted to explain this statement by testifying that, in his view, Gutzwiller's existing manuscript "wasn't rich enough or productive enough to warrant that many pages," J.App. at 1510, the evidence showed that he had not even read Gutzwiller's manuscript at the time he informed her of this additional requirement. Moreover, the evidence showed that no male member of the Department had ever been advised that he should publish a second book, independent of his dissertation, before he would be considered for tenure. Further, the evidence showed that Gutzwiller met or exceeded the number of publications of every tenured faculty member, except Fenik.
 
 
 36
 The jury could also have found evidence of Fenik's discriminatory intent in the manner in which he conducted the selection of Gutzwiller's outside evaluators. Gutzwiller introduced evidence that male members of the Department routinely got all five of the evaluators they requested and that requests to exclude a specific scholar were routinely granted. However, in her case, Fenik initially selected only two of the scholars she requested--including a scholar she had expressly requested not be included (Giangrande)--and denied her request that a German scholar be selected. While Gutzwiller eventually did get four of the evaluators she requested, this was the result of Dean Dember admonishing Fenik for diverging from the Department's published policy regarding outside evaluator selection.
 
 
 37
 As further evidence of discriminatory intent, the jury could have relied on the consistently negative interpretations Fenik (and Cohen) gave to what were generally favorable evaluations of Gutzwiller's scholarship. In this regard, the jury reviewed evidence that Dean Dember believed Fenik and Cohen had not given the letters an impartial interpretation. In the Dean's view, a "disinterested" evaluation of all of Gutzwiller's credentials, including her scholarship, "demand[ed] a positive recommendation." J.App. at 2073-75. As the Dean stated:
 
 
 38
 In conveying the rationale for [recommending against tenure, Cohen and Fenik] rely primarily on letters from the five outside reviewers. Both Professors Cohen and Fenik interpret the consensus of these letters as predominately unfavorable, offering an evaluation of Ms. Gutzwiller's work as merely competent but not original or outstanding. Careful perusal of these letters, however, convinces me that four out of the five are considerably more positive than the Committee's excerpts from them would suggest. Most of them generously praise the published writing and assert that the work in progress ... shows the writer growing in critical sophistication and offers promise for her scholarly future.
 
 
 39
 J.App. at 2074 (emphasis added). The trial judge properly admonished the jury that it was not to act as a "super tenure committee" and decide for itself whether Gutzwiller had the qualifications to be promoted. See J.App. at 1742. Nevertheless, in light of the Dean's comments as well as expert evidence regarding the high quality of Gutzwiller's scholarship, the jury could have inferred that the consistently negative interpretations by Fenik and Cohen of the outside evaluations was evidence of Gutzwiller being held to higher standards of scholarship than similarly situated men.
 
 
 40
 Many of the same instances evidencing Fenik's discriminatory intent also could reasonably have been interpreted by a jury to demonstrate the discriminatory motive of Cohen. Cohen, like Fenik, emphasized the negative points in his interpretation of the outside evaluations of Gutzwiller's work. He also told Gutzwiller that she needed to publish more even though she had already met or exceeded the number of publications of all the male members of the Department, with the exception of Fenik. In addition, there was testimony that Cohen told one member of the RPTC, prior to the Committee's meetings, that he intended to vote against both Gutzwiller and Michelini. Further, Gutzwiller testified that Cohen told her that when he met with a University official responsible for affirmative action, he told that person that he (Cohen) did not believe in affirmative action and did not intend to follow the University's guidelines. There was testimony that Cohen made similar comments to Michelini, stating that affirmative action was a lot of silly procedures and a waste of time. There was also testimony by Professor Walberg, the female member of the RPTC, that after Gutzwiller was denied tenure, Cohen said that he was not inclined to ever put women in tenure track positions again. Based on the totality of this evidence, the jury could have inferred that Cohen intentionally discriminated against Gutzwiller because of her sex.
 
 
 41
 Fenik and Cohen argue that even if the jury could have found evidence of discriminatory intent, they are nevertheless entitled to a new trial because the jury's verdict was fatally inconsistent under the "but for" causation requirement enunciated in Goostree and other cases. Because the jury did not find a majority of the RPTC or Provost Steger liable for sex discrimination, Fenik and Cohen contend that sex discrimination could not have been a "but for" cause of the denial of tenure. Fenik and Cohen stress that they were only two votes in a process that required decisions at four different levels. Moreover, Fenik emphasizes that he was only one vote on a five-person committee which unanimously recommended against tenure. Thus, while both defendants offered input at the departmental decisional level, neither had the authority to make a binding decision as to Gutzwiller's tenure. Accordingly, Fenik and Cohen argue, it was inconsistent for the jury to find them liable for discrimination while at the same time finding that the other four participants at the departmental level, and Provost Steger at the administration level, acted in a non-discriminatory manner. We are not persuaded by this argument.
 
 
 42
 The Goostree "but for" causation requirement is satisfied by a showing that defendant's discriminatory intent was more likely than not the basis of the adverse employment action. Goostree, 796 F.2d at 863. In our view, there was sufficient evidence from which the jury could find that the discriminatory intent of Fenik and Cohen was more likely than not the basis for Gutzwiller's denial of tenure. In particular, the evidence showed that most of the members of the RPTC, by their own admission, lacked the expertise to properly judge Gutzwiller's work and, therefore, relied exclusively upon the opinion of Fenik, the Committee chairman. Indeed, the majority of the Committee members had not even read any significant part of Gutzwiller's publications. There was also evidence that both Fenik and Cohen--the most powerful members of the Department--told at least one member of the RPTC prior to deliberations that they intended to vote against tenure for Gutzwiller. We believe there was sufficient evidence from which the jury could find that Fenik and Cohen, in imposing the additional book requirement, in distorting the outside evaluator process, and in ultimately influencing the opinions and votes of the other members of the RPTC, were the individuals whose discriminatory actions caused Gutzwiller to be denied tenure. The jury reasonably could have found that the actions of Fenik and Cohen influenced the other members of the Committee to vote against Gutzwiller and resulted in Provost Steger's negative tenure recommendation. Therefore, a causal link sufficient to satisfy the Goostree standard has been established.
 
 
 43
 Alternatively, Fenik and Cohen argue that the trial court committed reversible error in its instructions to the jury on the causation element of Gutzwiller's equal protection claim. In their view, the jury should have been given the instruction, approved by this court in Goostree, which directed the jury to find for Gutzwiller if the adverse employment action was taken "because she was a woman." Goostree, 796 F.2d at 862. Judge Rubin did not give the Goostree instruction, but instead instructed the jury as follows:The question that is presented to you on tenure is not whether you feel the plaintiff is qualified. The overall question is whether her sex was a determining factor in the denial of tenure. You must also consider as to each defendant whether the discrimination, if any, was intentional.
 
 
 44
 If you conclude that a male with the identical experience, ability and qualifications as the plaintiff would have been granted tenure then you should find for the plaintiff on this issue.
 
 
 45
 If you conclude that such male would not have received tenure, you should find for the defendants on this issue.
 
 
 46
 J.App. at 1742 (emphasis added).
 
 
 47
 While the instruction given by Judge Rubin did not mirror that approved by this court in Goostree, we nevertheless believe that it substantially conforms to the controlling law which provides that in order to find liability under section 1983, the jury must determine that the plaintiff was denied tenure because she was a woman. Accordingly, Judge Rubin's instruction was sufficient and a new trial is not warranted.
 
 
 48
 For the above-stated reasons, we conclude that the jury's verdict that Fenik and Cohen intentionally discriminated against Gutzwiller was neither against the weight of the evidence nor fatally inconsistent. Moreover, the jury instructions were consistent with the controlling law. Accordingly, Judge Rubin did not abuse his discretion in denying Fenik and Cohen's post-trial motion for a new trial on the equal protection claim.
 
 B.
 
 49
 Because we find that there was sufficient evidence to support the jury's verdict that Fenik and Cohen intentionally discriminated against Gutzwiller--thereby denying her equal protection--we conclude that there was also sufficient evidence from which the jury could find that these defendants deprived Gutzwiller of substantive due process of law.
 
 
 50
 The equal protection clause of the fourteenth amendment requires the government to treat similarly situated individuals in a similar manner. In the context of public employment, the equal protection clause prohibits invidious discrimination on the basis of the race or sex of the employee. See, e.g., Clark v. Whiting, 607 F.2d 634, 638-39 (4th Cir.1979). Substantive due process, a much more ephemeral concept, protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action. The fundamental rights protected by substantive due process arise from the Constitution itself and have been defined as those rights which are "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), overruled on other grounds, Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969). While this is admittedly a somewhat vague definition, it is generally held that an interest in liberty or property must be impaired before the protections of substantive due process become available. See, e.g., Regents of the University of Michigan v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 512, 88 L.Ed.2d 523 (1985); Jeffries v. Turkey Run Consolidated School District, 492 F.2d 1, 4-5 (7th Cir.1974). Even if such an interest has been impaired by governmental action, courts will review the challenged decision only for arbitrariness or capriciousness. Indeed, in the academic setting, as the Supreme Court made clear in Ewing, courts may override a decision under substantive due process only if that decision is "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Ewing, 106 S.Ct. at 513.
 
 
 51
 While the concepts of equal protection and substantive due process are defined differently, they are, in actuality, very similar concepts. Both stem from our American ideals of fundamental fairness and both enmesh the judiciary in substantive review of governmental action. The spheres of protection offered by the two concepts are not, to be sure, coterminous. However, they will overlap in certain situations so that a violation of one will constitute a violation of the other. In our view, this is such a situation. That is, for a tenure decision at a public university to be made on the basis of an individual's sex not only constitutes the kind of invidious discrimination prohibited by the equal protection clause but also constitutes an arbitrary and capricious deprivation of the individual's liberty interest in not being terminated from governmental employment for a constitutionally impermissible purpose. See, e.g., Clark, 607 F.2d at 638-39; Jeffries, 492 F.2d at 4-5 & n. 12.
 
 
 52
 Therefore, since we have held that the jury could have found that Fenik and Cohen intentionally discriminated against Gutzwiller, thereby denying her equal protection, it also could have found that these defendants denied Gutzwiller substantive due process. Certainly, a decision to deny tenure on the basis of a candidate's sex is, as a matter of law, such a substantial departure from accepted academic norms as to demonstrate that Fenik and Cohen did not exercise professional judgment. Accordingly, we reject Fenick and Cohen's argument that they are entitled to judgment on the substantive due process claim and hold that Judge Rubin did not abuse his discretion in denying their request for a new trial on this issue.
 
 C.
 
 53
 Finally, Fenik and Cohen raise three additional arguments in support of their contention that they are entitled to a new trial on liability issues under section 1983. They argue that a new trial should be granted because 1) certain inflammatory and unresponsive comments made by Gutzwiller at the trial were materially prejudicial to them; 2) the testimony of Gutzwiller's expert on the subject of sex discrimination, Professor Patricia O'Reilly, was prejudicial to them; and 3) the trial court's denial of their right to present surrebuttal evidence in response to the rebuttal testimony of Michelini significantly handicapped them. We have fully considered each of these arguments and find them to be without merit.
 
 III.
 
 54
 The next issue is whether the district court erred in setting aside the jury's award of punitive damages against Fenik and Cohen. Upon consideration, we conclude that the punitive damages award was not improper and should not have been disturbed by the district court.
 
 
 55
 The Supreme Court addressed the issue of punitive damages in section 1983 actions in Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). In that case, the Court concluded that punitive damages are appropriately considered by the jury when there has been "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law...." Id. at 51, 103 S.Ct. at 1638. Consistent with this standard, Judge Rubin instructed the jury that "reckless, willful or wanton behavior" inferred from the surrounding circumstances can provide the basis for a punitive damage award. J.App. at 1956. In our view, the question of whether Fenik and Cohen exhibited such conduct is a matter well within the province of the jury, as it requires the type of moral judgment that lay persons make every day.
 
 
 56
 In this case, the jury's finding that Fenik and Cohen acted recklessly and with callous disregard for Gutzwiller's rights is supported by substantial evidence. Accordingly, the district court's decision setting aside the punitive damages award as to Fenik and Cohen is reversed and the case is remanded to the trial court with directions to reinstate the jury's award.
 
 IV.
 
 57
 We next address Gutzwiller's argument that the lower court erred in granting JNOV to Steger on the substantive due process claim. Before addressing the merits of this argument, however, we must first consider Gutzwiller's argument that Steger waived his right to move for JNOV by failing to renew his directed verdict motion at the close of all the evidence.A.
 
 
 58
 Rule 50(b) of the Federal Rules of Civil Procedure provides in relevant part:
 
 
 59
 (b) Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion....
 
 
 60
 [A] party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict.
 
 
 61
 This Rule has long been construed to preclude a district court from entertaining a motion for JNOV unless the movant has first sought a directed verdict after presentation of all the evidence. Young v. Langley, 793 F.2d 792, 794 (6th Cir.1986), cert. denied, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1987); 5A J. Moore & J. Lucas, Moore's Federal Practice p 50.08 (2d ed. 1982). Where this prerequisite has not been satisfied, a party cannot later challenge the sufficiency of the evidence either through a JNOV motion or on appeal. Young, 793 F.2d at 794; Bohrer v. Hanes Corp., 715 F.2d 213, 216 (5th Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). Further, "where a defendant moves for [a] directed verdict at the close of plaintiff's testimony and does not renew its motion at the close of the entire testimony, defendant waives its original motion and is precluded from questioning the sufficiency of the evidence on appeal." Young, 793 F.2d at 794.
 
 
 62
 As explained by the Fifth Circuit in Bohrer, there are two purposes for the requirement of a motion for a directed verdict at the close of all the evidence as a predicate for JNOV:
 
 
 63
 to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury, thereby affording it an opportunity to cure any defects in proof should the motion have merit.
 
 
 64
 Bohrer v. Hanes Corp., 715 F.2d at 216; see also Benson v. Allphin, 786 F.2d 268, 273-74 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986); Merwine v. Bd. of Trustees, 754 F.2d 631, 634 (5th Cir.1985), cert. denied, 474 U.S. 823, 106 S.Ct. 76, 88 L.Ed.2d 62 (1986).
 
 
 65
 In this case, Gutzwiller claims that Steger's counsel made a tactical decision to withdraw his previous motion for a directed verdict, after the court had already renewed its consideration of the motion at the close of all the evidence, and specifically requested the court not to dismiss any defendants so that the jury would not think the court's "imprimatur" had been stamped on any defendant.[3] In Gutzwiller's view, by expressly withdrawing the motion, Steger waived his right to have the trial court examine the sufficiency of the evidence after the jury returned its verdict. We do not agree.
 
 
 66
 While this circuit has not directly addressed this issue, a number of the circuits have held that, in light of "liberal spirit imbuing the Federal Rules of Civil Procedure," Bohrer, 715 F.2d at 217, technical non-compliance with Rule 50(b)'s requirements will not preclude consideration of a JNOV motion so long as the purposes of the rule have been served in a particular case. See, e.g., Benson v. Allphin, supra; Merwine v. Bd. of Trustees, supra; Bohrer v. Hanes Corp., supra. As stated by the Seventh Circuit in an oft-quoted passage:
 
 
 67
 It is certainly the better and safer practice to renew the motion for directed verdict at the close of all the evidence, but "[t]he application of Rule 50(b) in any case 'should be examined in the light of the accomplishment of [its] particular purpose[s] as well as in the general context of securing a fair trial for all concerned in the quest for truth.' "
 
 
 68
 Bonner v. Coughlin, 657 F.2d 931, 959 (7th Cir.1981) (quoting Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 825 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979)).
 
 
 69
 In our view, the purposes of Rule 50(b) have been served in this case. At the close of Gutzwiller's case, Judge Rubin took defendants' motion for directed verdict under submission, thereby placing Gutzwiller's counsel on notice that the sufficiency of the evidence was being challenged. At the close of all the evidence, Judge Rubin, on his own initiative, renewed consideration of the earlier motion for directed verdict with respect to Steger and two other defendants. At that time, defense counsel requested the court to further reserve its ruling on the sufficiency of the evidence until after the jury's verdict, but made clear that he had no intention of waiving his right to later challenge the sufficiency of the evidence on motion for JNOV. As counsel stated:
 
 
 70
 I would much prefer to handle these matters on motions for JNOV if that becomes necessary.... My point, your Honor, is its my belief that if the evidence isn't there now, it won't be there after that jury verdict.
 
 
 71
 J.App. at 1673-74. On these facts, it is evident that all parties and the trial court recognized that the sufficiency of the evidence had been challenged, and that Steger's counsel intended to move for JNOV if necessary. Gutzwiller cannot claim that she was either suprised or prejudiced as a result of Steger's post-trial JNOV motion. Therefore, since the purposes of the Rule have been served, it was not error for the trial judge to entertain Steger's motion.
 
 B.
 
 72
 Having concluded that Judge Rubin did not err in considering Steger's JNOV motion, we must now decide whether the court was correct in ruling in Steger's favor on that motion. A grant of JNOV will not be set aside if, upon viewing the totality of the evidence most favorably to the non-moving party, the evidence " 'points so strongly in favor of the movant that reasonable minds could not come to a different conclusion.' " Ridenour v. Lawson Co., 791 F.2d 52, 55 (6th Cir.1986) (quoting Morelock v. NCR Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979)). Applying this standard to the instant case, we conclude that the district court did not err in granting Steger's JNOV motion.
 
 
 73
 As noted earlier, the Supreme Court consistently has assumed that federal courts may review academic decisions of public educational institutions under a substantive due process standard. See, e.g., Ewing, 106 S.Ct. at 512. However, the Court has also made clear that absent evidence of a constitutionally impermissible basis for a challenged academic decision--such as sex or race discrimination--courts and juries must be extremely reluctant to second guess the professional judgment of the academic decisionmakers. Id. at 513. Only when the challenged decision is arbitrary and capricious, and without rational basis, may it be set aside upon judicial review. Id.; see also Stevens v. Hunt, 646 F.2d 1168, 1170 (6th Cir.1981).
 
 
 74
 In the instant case, because Steger was found by the jury not to have discriminated against Gutzwiller in his consideration of her tenure application, the substantive due process verdict against Steger, unlike those against Fenik and Cohen, cannot be founded upon constitutionally impermissible sex discrimination. Rather, in order for the verdict against Steger to be sustained, there must be independent evidence to suggest that his conduct in considering Gutzwiller's application was "such a substantial departure from accepted academic norms as to demonstrate that [Steger] did not actually exercise professional judgment." Ewing, 106 S.Ct. at 513. Viewing the evidence in the light most favorable to Gutzwiller, we agree with Judge Rubin that no reasonable jury could conclude that Steger's conduct constituted a violation of substantive due process.
 
 
 75
 Steger's role in this entire matter was quite limited. He was not involved in the imposition of the additional scholarship requirement nor was he involved in the acrimony surrounding either the selection of Gutzwiller's outside evaluators or the interpretation of the evaluation letters. He did not become involved in the tenure decision until he conducted an independent review of the tenure file which, by then, included the negative recommendations of the RPTC and Cohen as well as the positive recommendation of Dean Dember.
 
 
 76
 We are constrained to note, however, that Steger's conduct in the course of his review of the tenure file was not entirely without blemish. For instance, we question his judgment in agreeing to meet with Cohen to discuss Gutzwiller's tenure (contrary to Steger's policy of not meeting with department heads or tenure candidates in connection with tenure review) but later refusing Gutzwiller's request for a similar meeting. Gutzwiller had a right to expect that if Steger met with Cohen he would, for the sake of procedural consistency and fairness, also agree to meet with her. Moreover, when Steger became President of UC, it might have been advisable for him not to act as the final arbiter of the grievance Gutzwiller filed after she was denied tenure, since his actions as Provost were challenged in that grievance.
 
 
 77
 While these and other instances may constitute errors in judgment, we nevertheless hold that a reasonable jury could not have concluded that Steger's actions were so arbitrary and capricious, or such a substantial departure from accepted academic norms, as to constitute a violation of Gutzwiller's substantive due process rights. At trial, Steger adequately explained the professional judgment that he exercised both as Provost and as President, and he explained the academic standards that guided his decisions. We are convinced that his decisions were the type of "genuinely academic decisions" that the Supreme Court contemplated in Ewing. Although Steger could have handled some things differently, any errors in judgment he might have made simply do not rise to the level of substantive due process violations. Any other conclusion on the facts of this case would be contrary to Ewing's clear admonition that, absent evidence of a constitutionally impermissible purpose, federal courts are to exercise considerable restraint in reviewing the substance of genuinely academic decisions. We adhere to that admonition.
 
 
 78
 For these reasons, the district court's grant of JNOV in Steger's favor is affirmed.
 
 V.
 
 79
 The next issue to be addressed is whether the trial judge erred in dismissing Gutzwiller's Title VII claim even though the jury had returned a verdict in her favor on the equal protection claim under section 1983. Judge Rubin dismissed the Title VII claim because he believed he was not bound by the jury's findings on the section 1983 claim. This was plainly incorrect.
 
 
 80
 Gutzwiller's suit sought equitable relief under Title VII and both legal and equitable relief under section 1983. The section 1983 equal protection claim and the Title VII claim arose out of the same underlying facts. In order to prevail under either claim, discriminatory intent causing the adverse employment action must be established by a preponderance of the evidence. See, e.g., Kitchen v. Chippewa Valley Schools, 825 F.2d 1004, 1011 (6th Cir.1987). When the section 1983 claim and the Title VII claim are tried jointly, as they were here, the principle of collateral estoppel controls. When " 'a party has a right to a jury trial on an issue involved in a legal claim, the judge is ... bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim.' " Kitchen v. Chippewa Valley Schools, 825 F.2d at 1014 (quoting Lincoln v. Board of Regents, 697 F.2d 928, 934 (11th Cir.), cert. denied, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983)). See also Garza v. City of Omaha, 814 F.2d 553, 557 (8th Cir.1987) ("Given the preclusive effect of collateral estoppel which must be accorded to the jury verdict, the district court was without power to render a judgment on the Title VII claim inconsistent with the jury's finding of discriminatory intent and custom on the Sec. 1983 claim."). Therefore, in ruling on Gutzwiller's Title VII claim, the trial judge was bound by the jury's express finding of liability as to Fenik and Cohen on the section 1983 equal protection claim, and was "without power" to reach a conclusion inconsistent with that of the jury.
 
 
 81
 Accordingly, we reverse the judgment of the district court on the Title VII claim, direct that judgment be entered in favor of Gutzwiller on that claim, and remand for a determination of the appropriate equitable relief.
 
 VI.
 
 82
 While the determination of the appropriate equitable relief is within the sound discretion of the trial court, we feel it necessary to briefly review certain principles to guide the district court on remand.
 
 
 83
 The equitable remedies awarded under both section 1983 and Title VII have the goal of making persons whole for injuries suffered on account of unlawful employment discrimination. See, e.g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Backpay is presumptively favored as a make-whole remedy and, absent exceptional circumstances, should be awarded to successful employment discrimination plaintiffs. Rasimas v. Michigan Department of Mental Health, 714 F.2d 614, 626 (6th Cir.1983), cert. denied, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). The back pay award should completely redress the economic injury the plaintiff has suffered as a result of discrimination. It should include the salary, including any raises, which plaintiff would have received but for the discrimination, as well as sick leave, vacation pay, pension benefits and other fringe benefits she would have received but for discrimination. Id. at 626-27; see also Shore v. Federal Express Corp., 777 F.2d 1155, 1159 (6th Cir.1985). Any amount which Gutzwiller earned, or with reasonable diligence could have earned, after she was denied tenure shall operate to reduce the backpay otherwise allowable. See 42 U.S.C. Sec. 2000e-5(g); Rasimas, 714 F.2d at 623.
 
 
 84
 Another presumptively favored equitable remedy is reinstatement. See, e.g., Henry v. Lennox Industries, 768 F.2d 746, 752-53 (6th Cir.1985). While reinstatement to her previous faculty position is undoubtedly consistent with the goal that Gutzwiller be made whole, Gutzwiller here seeks reinstatement with tenure. While a few courts have indicated a willingness to award reinstatement with tenure as a remedy in discrimination cases, see, e.g., Kunda v. Muhlenberg College, 621 F.2d 532, 546-51 (3rd Cir.1980), we believe such relief will, in most cases, entangle the courts in matters best left to academic professionals. Accordingly, such relief should be provided in only the most exceptional cases. Only when the court is convinced that a plaintiff reinstated to her former faculty position could not receive fair reconsideration (i.e. consideration without the taint of discrimination) of her tenure application should it order reinstatement with tenure. We are unable to make this determination at this stage of the case.
 
 
 85
 Finally, if reinstatement with tenure is denied by the court, the court should consider whether Gutzwiller is entitled to front pay. Any award of front pay should be guided by the principles enunciated by this court in Shore v. Federal Express Corp., 777 F.2d at 1158-60.
 
 VII.
 
 86
 For all of the reasons stated herein, we AFFIRM in part, REVERSE in part and REMAND for further proceedings consistent with this opinion.
 
 
 87
 WELLFORD, Circuit Judge, concurring in part and dissenting in part:
 
 
 88
 This case presents difficult problems because the plaintiff asserts a number of claims against various defendants under different federal statutes and a state statute dealing with claims of sex discrimination and/or constitutional violations related to sex discrimination. Title VII cases specifically call for trial by a court, not a jury, during which the court must exercise its equitable discretion in applying the remedy to be afforded if the plaintiff proves that proscribed and intended discrimination has occurred. Section 1983 actions entitle one to a jury trial, but such claims raised in a university setting are problematic because they involve decisions regarding faculty selections and promotion. It is even more difficult when the decisions occur within a Department of Classics with respect to a faculty member's charge of a Sec. 1983 constitutional violation associated with a denial of tenure, because such decisions are inherently fraught with a high degree of selectivity, classical learning, and academic criteria and evaluation--matters foreign to most juries.[1]
 
 
 89
 There were few females in the University of Cincinnati Department of Classics when Gutzwiller was first chosen as a faculty member in 1978, or while she served in that Department. We do not know whether or not there were few qualified female professors in this academic speciality in the late 1970s generally or whether this may have been peculiar to the University of Cincinnati (UC). We are told that the first award of tenure to a female classics professor at UC occurred in 1982. At that time, there were at least three female professors in the Department, a substantial proportion of that faculty. Two years before plaintiff was denied tenure, defendant Getzel Cohen became head of the Classics Department, having replaced defendant Bernard Fenik in that position.
 
 
 90
 In the 1982 year-end review of Gutzwiller's performance, Dr. Cohen indicated that her progress at UC would depend on "further work produced" by her. He also referred to a potential imbalance in the Classics Department (Hellenists outnumbering Latinists). Gutzwiller then realized, contrary to her original understanding with Fenik, that she and another professor, Michelini, were competing for a single tenured position in the Department. When Michelini, a female, was chosen for tenure instead of the plaintiff, the latter claimed sex discrimination.
 
 
 91
 It was not unusual that the tenure decision in dispute was based primarily on an evaluation of the quality of the candidate's scholarship (by its nature a subjective appraisal). Outside evaluators were chosen to assist the Department in assessing the published work produced by the candidate.
 
 
 92
 The selection of these outside evaluators was made by Fenik, who chose only two from Gutzwiller's list (none of them foreign scholars). Fenik also chose Professor Giangrande and one of Giangrande's alleged proteges. Giangrande was the one scholar Gutzwiller specifically requested not be selected to evaluate her work. Gutzwiller complained to Fenik and to the Dean of the College of Arts and Sciences because departmental policy dictated that at least three of the outside evaluators be selected from the candidate's list. The list of evaluators was thereupon changed, and four of the outside scholars suggested by Gutzwiller were selected. Following a review of her file and outside evaluators' reports, the tenure committee unanimously recommended against tenure. In joining and in forwarding this negative recommendation to Dean William Dember, Fenik made favorable comments about Gutzwiller's teaching and service, but emphasized the deficiencies found by the evaluators in her scholarship, including a "lack of originality." He also indicated the Department's need for another Latinist to offset the preponderance of Greek Philology specialists, such as Gutzwiller. Cohen also recommended against tenure for Gutzwiller and agreed generally with Fenik's assessment.
 
 
 93
 Gutzwiller took particular issue with the letters of both Fenik and Cohen, and she added to her tenure file a number of letters of recommendation, including one from Michelini, who was recommended for tenure by Fenik and Cohen. Gutzwiller deemed the appraisal of her scholarship by the outside evaluators to be essentially favorable, but apparently none of her colleagues involved in the tenure process entirely agreed with her analysis. She also objected to Fenik and Cohen's mention of "program needs" with respect to the tenure decision, and charged sex discrimination.
 
 
 94
 After reviewing the entire file, Dean Dember recommended to Provost Joseph Steger, contrary to the Department's decision, that Gutzwiller be awarded tenure. Dember felt that Gutzwiller had fulfilled the expectations of the Department as enunciated when she was hired, although he did express some reservations about her scholarship.
 
 
 95
 Before passing upon the tenure question, Provost Steger requested information on the needs of the Classics Department, and obtained a report from the Law School Dean on the discrimination claim.[2] (Cohen supplied the requested information on departmental needs.) He then decided not to recommend her for tenure.
 
 
 96
 Gutzwiller maintained then and now that the AAUP contract, under which she was covered, precluded consideration of "program needs" or department needs in connection with faculty retention and tenure decisions. UC President Winkler concurred with Steger's decision, and the Board of Trustees voted to deny Gutzwiller tenure. Of all those involved in this tenure question from an academic perspective--more than fifteen in number--only Dean Dember had considered it favorably.
 
 
 97
 In accordance with her rights under UC procedures, Gutzwiller filed a grievance against the tenure committee, Fenik, Cohen, and Steger, who by this time had become UC President, succeeding Winkler. The Grievance Committee recommended a new review of Gutzwiller's application and a one-year extension of her employment contract, noting procedural irregularities in the compilation of her dossier, the selection of outside reviewers, the consideration of "program needs," and the alleged partiality in the recommendations forwarded to Provost Steger. The Grievance Committee also suggested that a new and different tenure committee, without Fenik, conduct the review. Steger followed most of the Grievance Committee's recommendations, but he declined to appoint a new interdepartmental tenure committee. Gutzwiller refused this offer of a review and contract extension, and promptly filed this lawsuit[3] against UC, all members of the departmental tenure committee, Cohen, Steger, Christensen, the Board of Trustees, the acting Provost and others, including the Secretary of Education of the United States.
 
 
 98
 The Sec. 1983 claims were tried before a jury while the Title VII claim was tried before the trial judge only (as Congress has provided in Title VII). Judge Rubin, on essentially the same facts submitted to the jury, found the defendants to be credible with respect to their explanations of Gutzwiller's relatively insufficient scholarship, and joined the all but unanimous view of the University faculty and administration charged with tenure responsibility in that respect. For this view of the evidence on the scholarship issue, plaintiff's counsel infers that the district court's view was biased. See Reply Brief at 8.
 
 
 99
 The jury returned a verdict against Fenik and Cohen only for Sec. 1983 intentional discrimination by reason of sex. The jury also decided that these two defendants and Steger had "denied her substantive due process." Appellant's Brief at 1. The jury subsequently returned a verdict of $150,000 in total compensatory damages and $128,000 in punitive damages.[4] The district court denied backpay, reinstatement, or tenure, and dismissed the Title VII claim for equitable relief in addition to damages. The district court also granted Steger's j.n.o.v. motion and set aside the punitive damages award. Appeals and cross appeals have been filed by the plaintiff and defendants Fenik and Cohen.
 
 I. Steger Judgment
 
 100
 I agree with the majority, essentially for the reasons indicated, that the district court did not err in granting Steger's motion for j.n.o.v. I agree particularly with regard to the discussion of Fed.R.Civ.P. 50(b), and in the conclusion that the "purposes of the rule have been met in this case." I further agree that no reasonable factfinder viewing the record in this case "could conclude that Steger's conduct constituted a violation of substantive due process." I see no problem with Steger acting as "final arbiter" of Gutzwiller's grievance when he became UC President, and would note no "error in judgment" in his so serving. His decisions in the course of this controversy, like those of the other participants, including the tenure committee, were indeed "genuinely academic decisions." Former President Winkler concurred fully in Steger's recommendation against tenure. I would, then, affirm the judgment granted to defendant Steger. This necessarily indicates that President Steger's final decision not to grant tenure was essentially an independent, nondiscriminatory judgment.
 
 II. Fenik--Sex Discrimination
 
 101
 Although it is in my view a very close question, I would find that Gutzwiller's claim of intentional sex discrimination against Fenik was not supported by substantial evidence. Fenik's actions with regard to the outside evaluators did not adversely affect Gutzwiller unless it is agreed that she was entitled to name all of her own evaluators, in which case there is no need for any independent participation in examining seriously her scholarship qualifications for tenure. I would find as a matter of law that the naming and selection of the evaluators is immaterial in this case because Gutzwiller received a basically fair evaluation by her peers, and that is all she was entitled to receive. That she and Fenik disagreed about who the evaluators might be and the interpretation to be given the evaluators' reports is, in my view, irrelevant.[5] Even if Fenik were deemed to have acted in this regard with some discriminatory animus, it makes no difference because the outside evaluation process was fair.
 
 
 102
 Even if there was sufficient evidence for a jury to find that Fenik "treated Gutzwiller less favorably throughout the evaluation process than he treated men," I conclude that Fenik's conduct was not a cause of Gutzwiller's denial of tenure. None of the other five tenure department committee members were found to have acted in a discriminatory fashion. Fenik acted as one member of that committee, and as chairman forwarded the committee's adverse recommendation (which the majority concedes included "favorable comments about Gutzwiller's performance in the 'teaching' and 'service to the department' categories") to the Provost. Fenik described her published work, including one work in progress, as "competent," "lucid," and "thorough" but marked by a "lack of originality." That Fenik felt and commented that the department needed a balance between "Latinists" and "Hellenists" cannot, it seems to me, be deemed sexist in its orientation, primarily because this factor favored another female tenure candidate, Michelini.[6] Moreover, Gutzwiller herself contended that she had previously worked as a Latinist.
 
 
 103
 The majority indicates, and I agree, that the plaintiff cannot meet her burden in this kind of case merely by showing evidence of discriminatory intent. Instead, she "is required to demonstrate that the adverse employment decision would not have taken place 'but for' her sex." More than that, Gutzwiller must demonstrate that Fenik's alleged discriminatory intent was a proximate cause of her not being selected for tenure. In my view, she has done neither.
 
 
 104
 Each person involved in the selection process reviewed the file, the submissions, and the outside evaluations regarding Gutzwiller's teaching, scholarship, and service, and decided to deny tenure.[7] Other than Cohen and Fenik, no one else in that process was found to have acted in a discriminatory fashion due to Gutzwiller's sex. A major contention of Gutzwiller is that "program needs" were improperly considered. If true, this might be a basis for a breach of contract claim. But, it will not support an allegation of sex discrimination. Plaintiff did not pursue her breach of contract claim. In addition, the record in this case indicates that a number of females taught in the Classics Department--at least three while Fenik was the department head--and that at least two were granted tenure at or about the relevant time period.
 
 
 105
 That Fenik may have indicated to Gutzwiller that it was important for her to publish another book and that such suggestion was not made to some male professors is not a cause of Gutzwiller's failure to attain tenure. Gutzwiller's principal allegations against Fenik involved his role as tenure committee chair and his method of selecting outside evaluators. Neither of these actions, if taken as evidence of a discriminatory intent, can reasonably be deemed a causative factor in the denial of her tenure in 1983-84. I would, therefore, set aside the jury's verdict against Fenik.
 
 
 106
 It should also be noted that the UC Grievance Committee found that Gutzwiller had not sustained her claim of sex discrimination. Rather, the Committee felt that procedural irregularities, namely consideration of department needs and a failure to follow normal procedures in selecting outside evaluators, had occurred.
 
 
 107
 Apart from my conclusion that the plaintiff failed to present sufficient proof of sex discrimination to sustain her burden, I find the district court to be supported by the record in setting aside the punitive damages based on the sex discrimination charges. There is simply no proof of a pattern of egregious conduct on the part of Fenik indicative of sex discrimination against Gutzwiller or other females.
 
 III. Cohen--Sex Discrimination
 
 108
 As department head when the Gutzwiller tenure decision was made, Cohen expressed his concern about the Department's "program needs." This is the principal basis of Gutzwiller's claim against Cohen. In September 1983, Thomas Wagner, Senior Vice President and Provost at UC, advised Cohen that in his unequivocal opinion, "confirmed by Legal Advisory Services, that Article 6, Section 5(A) permits academic departments to consider program needs (including, in your case, the imbalance between Greek philologist and Latin philologist) in making decisions about the tenure and reappointment of faculty members." At the same time, Cohen was instructed to notify faculty members and the AAUP of this concern. Both Fenik and Cohen were charged by Gutzwiller of having advised her about this continuing concern, and the imbalance was noted by an impartial outside group evaluating the department in 1981. At worst, then, Cohen's actions represented a misconception by him (a normal one under the circumstances, in my view) that this imbalance might be a factor in his decision as department head in considering an aspiring professor's bid for tenure.
 
 
 109
 Cohen's letter of December 20, 1983 concerning Gutzwiller's bid for tenure described her as a "fine teacher," and "well informed." At the same time, he indicated that her performance as a director of graduate studies reflected inflexibility in dealing with students and that she compared unfavorably--as to her scholarship attainments--with recent applicants, specifically Professor Walberg (a female granted tenure) and Professor Thomas (a male granted tenure).
 
 
 110
 Cohen had previously advised Gutzwiller that she needed to produce further quality-type of scholarly work, and there was no showing that he, as a recently appointed department head, had singled her out capriciously or discriminatorily in this regard. Cohen was not shown to have excluded females from the Classics Department nor to have prevented females from being promoted within the Department.
 
 
 111
 If consideration of program needs was inconsistent with the AAUP contract at UC, contrary to the University's specific advice to Cohen, this was a matter of breach of contract but not a matter of, nor evidence of, sex discrimination, particularly in light of favorable treatment given other female faculty members in the department, Michelini and Walberg.
 
 
 112
 In light of the facts in the case, I would conclude that there is insufficient proof of intentional sex discrimination on the part of Cohen that proximately caused Gutzwiller's denial of tenure. Those in the administrative process who acted on the tenure application, both before and after Cohen acted, had ample independent authority and basis to appraise Gutzwiller's scholarship and qualifications apart from Cohen's decision that she did not meet his Department's tenure requirements. There is no basis, in my view, for this court, or the jury, to assume that the members of the tenure committee and the higher administrative decisionmakers at UC were so influenced by Fenik and/or Cohen that they abandoned their independent and serious responsibilities to judge Gutzwiller on the merits of her application. The jury, it is to be remembered, found no sex discrimination on the part of any of these others. I would hold, therefore, that the judgment against Cohen based on alleged sex discrimination should be set aside.
 
 IV. Substantive Due Process Violation
 
 113
 Having agreed that there is no basis for a judgment against defendant Steger for a claimed violation of substantive due process, I review the judgment rendered against Fenik and Cohen on this ground. I have concluded in the previous sections that the claims against Fenik and Cohen based on alleged intentional sex discrimination were not supported by sufficient evidence, particularly as to causation. As pointed out in Blalock v. Metals Trades, Inc., 775 F.2d 703, 710 (6th Cir.1985), even if a plaintiff had established a prima facie case of discrimination, the plaintiff must still prove that she is qualified for tenure and the defendants may show that she would not have been awarded tenure even if she had been a male. This is not a pattern or practice case against any defendant concerned with hiring and promotion in the Classics Department at UC. It concerns only one female plaintiff who was not chosen for tenure, while another female in the same department was chosen. It is not, in my view, the function of the court or jury to direct UC to accept Gutzwiller as a tenured professor when it has accepted another female with a similar or better application for tenure.
 
 
 114
 Read fairly and reasonably, the record in this case indicates, at best, that Fenik and Cohen may have acted in a discriminatory fashion against Gutzwiller, not by reason of sex, but rather by reason of her pursuing a career as a Hellenist rather than a Latinist. Such "discriminatory" action may not be "fair," or in accordance with UC's contractual undertaking with the plaintiff, but it is not action that violates Title VII or 42 U.S.C. Sec. 1983. Gutzwiller has proved only that these defendants acted adversely against her because her selection would have created an imbalance in the Classics Department between Hellenists and Latinists. In other words, the record clearly shows that the same decision would have been reached even if Gutzwiller had been male. Blalock, 775 F.2d at 711 (citing Zebedeo v. Martin E. Segal Co., 582 F.Supp. 1394, 1412 n. 7 [D.Conn. 1984]). In short, the plaintiff has not proven that sex was a "motivating factor" in the decision to deny tenure. See Blalock, 775 F.2d at 712. Nor has the plaintiff shown that "but for" her sex, she would have been selected for tenure. Goostree v. State of Tennessee, 796 F.2d 854, 863 (6th Cir.1986), cert. denied sub nom. Goostree v. Montgomery County Quarterly Court, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987).
 
 
 115
 The majority sets out, properly I believe, that "substantive due process" is an "ephemeral concept." It concedes that in an academic setting, courts may override a decision adjudging qualifications or scholarly attainment only if "the person or committee responsible did not actually exercise professional judgment." Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985). There is no showing that the persons and committees responsible for the tenure decision in question did not exercise their professional judgment. It may have been based on improper contractual standards, department and program needs, or misapprehensions about Gutzwiller's scholarly attainments vis-a-vis other applicants, but the decision was unquestionably made by professors and academics in the exercise of their independent and somewhat subjective appraisals of Gutzwiller's qualifications and the needs and requirements of UC at the time. Even if a wrong decision was made, it did not rise to the level of a substantive due process violation.
 
 
 116
 First, I find no showing of a liberty interest violation.
 
 
 117
 "[T]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." Bishop v. Wood (1976) 426 U.S. 341, 349-50, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684. This is especially so where the claim for relief rests on what we have referred to as the " 'I'm just as good as you are' " argument. Faro v. New York University, supra, [2d Cir. 1974] 502 F.2d [1229] at 1232. Denial of a faculty promotion based on an evaluation of the faculty member's "scholarly achievements" is exactly the type of determination which, under Wood, is not justiciable in federal court in an action under Sec. 1983. And that has long been the ruling uniformly applied by the courts, and now affirmed in Wood, for which there is an abundance of supporting reasons.
 
 
 118
 A teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, determinations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests. These determinations are in "an area in which school officials must remain free to exercise their judgment" especially since these determinations present unique questions for judgment by those with expertise in the specialized academic area, capable of making professional evaluations of those elusive and intangible qualities and talents expected of the scholar and teacher. Courts are not qualified to review and substitute their judgment for these subjective, discretionary judgments of professional experts on faculty promotions or to engage independently in an intelligent informal comparison of the scholarly contributions or teaching talents of one faculty member denied promotion with those of another faculty member granted a promotion; in short, courts may not engage in "second-guessing" the University authorities in connection with faculty promotions. Yet that is exactly what the plaintiff seeks by his action to have the court do.
 
 
 119
 If perchance courts were, on equal protection grounds, to undertake to review faculty promotions by engaging in a comparison of competency and qualifications of those granted and those denied promotion in any academic field, they would, by parity of reasoning, be obligated to review the equality of treatment in connection with the grant or denial of faculty tenure. Nor is it a far step from such a review of faculty promotions and tenure to faculty salaries or assignments. In essence, what plaintiff thus argues for, if carried to its logical conclusion, is the judicial supervision of the most delicate part of every state educational institution's academic operations, a role federal courts have neither the competency nor the resources to undertake.
 
 
 120
 Clark v. Whiting, 607 F.2d 634, 639, 640 (4th Cir.1979) (footnotes omitted).
 
 
 121
 Moreover, no property right is involved in this case because Gutzwiller had no reasonable expectation that tenure would be granted. Accordingly, I would find no demonstrated violation of substantive due process on the part of any defendant.
 
 V. Punitive Damages
 
 122
 For the reasons indicated, I would find any award of damages inappropriate in this case. This conclusion would, of course, bar any award of punitive damages. I would affirm the district court in setting aside punitive damages in any event for the reasons stated by it. I can find no basis for a conclusion that Fenik and/or Cohen acted "recklessly and with callous disregard for Gutzwiller's rights" as a female applicant for tenure.
 
 VI. Title VII Considerations
 
 123
 If the jury verdict against defendants Fenik and Cohen were permitted to stand as the majority holds, I would, nevertheless, affirm the district court's decision, as a matter of equity, not to add to the damages assessed by calculating additional "backpay." The damages awarded more than adequately provide for any backpay due the plaintiff. There is no showing by the plaintiff, moreover, that she has seriously attempted to mitigate her damages either by accepting the one-year extension or otherwise. See Shore v. Federal Express Corp., 777 F.2d 1155, 1157, 1158 (6th Cir.1985). The fringe benefits as a form of backpay claimed by plaintiff are also adequately covered by the damage awards assessed against Fenik and Cohen. In addition, reinstatement may be an inappropriate remedy under circumstances potentially involving serious fruition, displacement, or hostility that could preclude a "satisfactory employment relationship." Id. at 1159.
 
 
 124
 No case is cited by the plaintiff to support her claim that this court, or the district court, should direct tenure to Gutzwiller. The majority cites only Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir.1980), to this effect. Kunda involved an affirmance by a divided court of a district court's award of tenure to a physical education teacher whose qualifications (unlike Gutzwiller's) were "not in dispute" and who was "considered qualified by the unanimous vote of both faculty committees which evaluated her teaching, research and creative work." Id. at 548. In addition, the department chairman in Kunda found the teacher qualified for tenure and the district judge who had heard the case expressly found her "qualified for tenure as well as for promotion." Id. at 540. Under those highly unusual circumstances, although the court was "loathe to act as a 'super-tenure review committee,' " it affirmed what was argued to be the first case involving a "judicial award of tenure." Id. at 540, 547, despite stating:
 
 
 125
 That decision is most effectively made within the university and although there may be tension between the faculty and the administration on their relative roles and responsibilities, it is generally acknowledged that the faculty has at least the initial, if not the primary, responsibility for judging candidates. "[T]he peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." Johnson v. University of Pittsburgh, 435 F.Supp. 1328, 1346 (W.D.Pa.1977).
 
 
 126
 Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure.
 
 
 127
 Kunda, 621 F.2d at 547, 548. The dissenter, Judge Garth, with whose opinion I agree, stated:
 
 
 128
 This remedy, in my view, is not called for on this record and constitutes a serious judicial intrusion upon the obligations and responsibilities of Muhlenberg's Board of Trustees.
 
 
 129
 The majority properly concedes that tenure is "the most provocative issue raised on [this] appeal" (At 546); that tenure determinations include, among other considerations, judgments of future enrollment, budgetary factors, determinations of different and higher priorities, and the like; and that tenure decisions comprehend "discretionary academic determinations" (At 547) entailing review of the candidate's work product. These decisions, the majority admits, are most effectively made within the university.
 
 
 130
 * * *
 
 
 131
 [T]he majority acknowledges that the evaluation of tenure should be made by professionals "since they [the evaluations] often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." (At 548). The majority also recites, without dispute, the appellants' argument that the district court's order dealing with tenure is unique and that this is the first case in which judicial award of tenure is sustained.
 
 
 132
 Id. at 552 (Garth, J., dissenting).
 
 
 133
 Case law is replete with authority to support Judge Garth's conclusion that it is not for the courts to direct tenure in a case of this kind, any more than federal courts should direct the award of a doctor's certificate as a specialist in anesthesiology or a license as a certified public accountant, especially when professional peers have recommended otherwise. I would, therefore, dissent from the suggestion of further consideration of tenure or "front pay" in this case as directed by the majority.
 
 
 
 [1]
 The University was dismissed from the suit on Eleventh Amendment grounds and is, therefore, not a party to this appeal
 
 
 [2]
 At the time of Gutzwiller's review, the five professors on the RPTC were Fenik, Michael Sage, Archie Christopherson, Walberg, and Gerald Cadogan. As mentioned, Walberg was the only female. All five of these individuals were defendants in the original suit and, with the exception of Fenik, all were found by the jury not to have discriminated against Gutzwiller. Accordingly, of the five RPTC members, only Fenik remains a defendant in this appeal
 
 
 [3]
 Gutzwiller points to the following sidebar which occurred between the court and counsel for defendants:
 THE COURT: You don't want [defendant Cadogan] dismissed?
 MR. FALLER: My difficulty is this. I would much prefer to handle these matters on motions for JNOV, if that becomes necessary, simply because it appears to me that so long as we are submitting interrogatories to the jury with individual names, it appears that the court's imprimatur is associated with a singling out of individual defendants.
 THE COURT: Mr. Faller, you are his attorney. If you withdraw your motion, which you made at the conclusion of the plaintiff's case, which I took under submission, I won't do it. I'll drop this matter right now.
 MR. FALLER: My point, your Honor, is it's my belief that if the evidence isn't there now, it won't be there after that jury verdict.
 THE COURT: I will drop the matter completely. I won't proceed as to Walberg and Steger either. No problem.
 MR. FALLER: Thank you, your Honor.
 (Before the Jury)
 THE COURT: Let the record show that at the request of defense counsel, these motions will not be further considered....
 J.App. at 1673-74.
 
 
 [1]
 Few judges, let alone jurors, understand the full nature of "Classical Philology," asserted to be plaintiff Gutzwiller's academic specialty. Webster's Third New International Dictionary (1966) advises us that "philology" is the "love of argument, learning and literature" or a "study of literature that includes or may include grammar, criticism, literary history, language, history, etc."
 
 
 [2]
 Dean Christensen conducted an independent investigation on the sex discrimination charge and found no basis to sustain the claim
 
 
 [3]
 The complaint--which if plaintiff prevails against any defendant will, no doubt, be a basis of a claim for attorneys' fees--consisted of 56 pages and included duplicative language claims under Title VII, Sec. 1983, Sec. 1985 and Sec. 1986 (against Steger), 20 U.S.C. Sec. 1681, O.R.C. Sec. 4112.02, the Equal Pay Act, for breach of and tortious interference with contract, negligent, and intentional infliction of emotional distress, fraud, breach of fiduciary duty, libel, and deceptive advertising. The Civil Rights Act claims included subclaims for violations of equal protection, deprivation of liberty and property interests, violations of both procedural and substantive due process, and violations of first amendment rights
 
 
 [4]
 Cohen and Steger were held liable for $40,000 each in compensatory damages; Cohen for $38,000 in punitive damages; and Steger for $40,000 in punitive damages. The balance (and the largest amount) was assessed against Fenik
 
 
 [5]
 Gutzwiller maintains in her appellate brief that "four of the five responses by Professor Gutzwiller's outside evaluators were clearly positive and even enthusiastic about her scholarship." How can selection of the evaluators really be an issue if this is the case?
 
 
 [6]
 The concern about "program needs" might be a basis for breach of contract claim, but it is not, under the circumstances of this case, a basis for a sex discrimination claim
 
 
 [7]
 The one exception was Dean Dember, who reviewed the file but recommended that tenure be granted