**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 14a0188n.06**

**No. 13-3489**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Mar 10, 2014

DEBORAH S. HUNT, Clerk

| | |
|---|---|
| MARVIN THRASH, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| MIAMI UNIVERSITY; SHASHI LALVANI, | ) |
| | ) |
| Defendants-Appellees. | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

BEFORE: MOORE and GRIFFIN, Circuit Judges; and KORMAN, District Judge.[*]

GRIFFIN, Circuit Judge.

In this civil rights case, plaintiff Dr. Marvin Thrash, an African-American former faculty member at Miami University (the University), appeals the district court's grant of summary judgment to defendants, the University and Dr. Shashi Lalvani, the chair of the academic department in which Dr. Thrash worked. For the reasons set forth below, we affirm.

I.

In 2004, a search committee conducted a search to fill a single, open tenure-track position in the University's Department of Paper Science and Engineering (the Department). The committee's list of finalists for the position included Dr. Thrash and Dr. Lei Kerr. The committee recommended Dr. Kerr as its first choice, while also recommending that the University bring Dr.

---

[*] The Honorable Edward R. Korman, Senior United States District Judge for the Eastern District of New York, sitting by designation.

Thrash into the Department as a tenure-track "opportunity hire." According to Dr. Marek Dollar, Dean of the School of Engineering and Applied Sciences, an "opportunity hire" was a hire made pursuant to an "informal policy" at the University of obtaining funding to hire candidates who were under-represented minorities even if the University did not have a position open.

The University utilizes a complex, multi-tiered approach to tenure decisions, and Dr. Thrash's tenure decision followed this approach. The University's criteria for obtaining tenure are: (1) high quality teaching and academic advising; (2) research, scholarly and/or creative achievement of high quality and its prospective continuation; (3) productive professional service; and (4) professional collegiality within the department, division, campuses, and University community. The University "places importance on both teaching and research" and "neither aspect of a candidate's career should be neglected if tenure is to be achieved."

Ordinarily, when a tenure-track instructor is hired, he or she is placed on a multi-year "probationary period" during which time he or she is evaluated yearly using the four tenure criteria. Each year, the department-level promotion and tenure (P&T) committee, the department chair, and the division dean evaluate the candidate. In this case, the department-level P&T committee consisted of three tenured faculty members from the Department, and did not include Dr. Lalvani. At the end of the third, fourth, and fifth year, the provost reviews these evaluations. In the candidate's final probationary year, the candidate makes his or her formal application for tenure. As part of his or her formal application for tenure, the candidate must compile a dossier in support of his or her tenure application that must include at least four letters from external reviewers. According to the University's guidelines for dossier preparation, "[s]election of the external reviewers is the responsibility of the chair/program director and divisional dean," who, "in

consultation with the candidate[,]" should develop a longer list of reviewers before narrowing down the final list of reviewers. At the department level, in the candidate's final year, the department-level P&T committee reviews the cumulative record and makes a recommendation to the department chair whether the candidate should be granted tenure. The chair then makes a recommendation to the dean. If the candidate has received a positive recommendation at any stage up to this point, the application is submitted to the University P&T committee. The University P&T committee consists of the provost, the deans of the academic divisions, the graduate dean, the dean of the regional campuses, and six tenured members of the instructional staff. The University P&T committee reviews the candidate's application, the departmental recommendation, and the dean's recommendation when making its determination. If the University P&T committee makes a negative tenure decision, the candidate is not given tenure.

Dr. Thrash's first-year review from his peers on the department-level P&T committee acknowledged his strong teaching skills, but noted that he was deficient in the area of research. Specifically, the committee noted, among other things, that research was "an area that require[d] some attention," and that Dr. Thrash only had one listed publication. Dr. Thrash's first-year review from Dr. Lalvani, the department chair, noted that Dr. Thrash is a "pleasant person and gets along well with students and colleagues," but added that "[i]t would be good if he can find time to focus on his research activities." Dr. Thrash's second-year review from the department-level P&T committee noted that although Dr. Thrash had improved and was making "progress towards achieving promotion and tenure . . . [o]ne area that we judge your efforts may have to be more vigorously sustained is that in grantsmanship," noting that none of his efforts to date had been successfully funded. By the third year, Dr. Thrash's peers continued to express concern about his

research. For example, the department-level P&T committee concluded that Dr. Thrash needed to "strengthen his [research] portfolio by clearly defining his research agenda" and "encourag[ed] Dr. Thrash to carry through with his plans to publish the anticipated results of [his] three current research projects . . . ." Similarly, Dean Dollar's third-year review stated that Dr. Thrash "has good quality; now he has to work on the quantity, particularly because he has no publications in peer-reviewed conference proceedings." Dr. Lalvani wrote in his third-year evaluation that he "strongly encourage[d] Dr. Thrash to publish his research in peer-reviewed journals and to continue to seek out funding . . . ." Provost Jeffrey Herbst noted in his third-year review that Dr. Thrash had published one journal article and had another accepted for publication, and that it was "crucial that you establish a record of continuous publications in high-quality, peer-reviewed national journals in order to be successful in gaining tenure and promotion."

Dr. Thrash's fourth-year reviews were more direct. The department-level P&T committee found that, although Dr. Thrash excelled at teaching,

> [t]he P&T guidelines require that you establish a record of high-quality publications at Miami. In the judgment of the committee this has not been done yet . . . . Your final dossier should demonstrate growth in scholarship over your first five years at Miami to show that you have established a record of high-quality publications and a viable research program.

The committee specifically found that "the research productivity of a tenure track assistant professor needs to increase during the probationary period. The P&T committee feels growth in the fourth year should have been higher." Similarly, Provost Herbst noted in his fourth-year review that Dr. Thrash "published one peer-reviewed journal article in 2008" and that his "only other journal publication was in 2006," and that he was concerned about Dr. Thrash's publication record.

Dr. Thrash's fifth-year reviews were more positive. The department-level P&T committee, Dr. Lalvani, and Dean Dollar all noted that in the previous year, Dr. Thrash had three papers accepted for publication in peer-reviewed journals. However, the committee also continued to "recommend[] that you further strengthen your research agenda in your [P&T] dossier." Similarly, Dean Dollar's fifth-year review praised Dr. Thrash's improvements in securing publications, but stressed "the need to demonstrate prospective continuation of his research in the years to come." Provost Herbst commended Dr. Thrash on his increased publications, but added that it was still "essential that you indicate the nature of your contribution on multi-authored publications."

When preparing his P&T dossier in the summer of 2010, Dr. Thrash initially submitted to Dr. Lalvani a list of twelve names to be external recommenders. Some of the names on the list were of professors at historically black colleges and universities (HBCUs). According to Dr. Thrash, upon receiving the list, Dr. Lalvani told Dr. Thrash that he would not be permitted to use any reviewer from any HBCU. Dr. Lalvani denies that such a discussion ever took place. Dr. Lalvani approved three of the twelve names and requested that Dr. Thrash submit two or three more names, which Dr. Thrash did. Following an exchange of emails, Dr. Lalvani emailed Dr. Thrash with the final list of six reviewers, plus one backup reviewer. Four of the final six reviewers were names proposed by Dr. Thrash, and four of the final six reviewers were African-American.

Having selected the external reviewers, Dr. Lalvani prepared to send the external reviewers the materials they would need to conduct their assessments of Dr. Thrash: Dr. Thrash's CV, copies of Dr. Thrash's selected publications, and a letter from Dr. Lalvani instructing the reviewers about the scope of their review. Before those materials were sent, Dr. Thrash contacted Dr. Lalvani and asked him to include, in addition to the standard materials, a letter prepared by Dr. Thrash. The

proposed letter attempted to contextualize Dr. Thrash's experience at the University; for example, the letter stressed that there was no full engineering department at the University until 2009; that Dr. Thrash was the only bioengineering professor at the University and therefore had to create many of his own courses; and that it had been "difficult building a bioresearch program in a department in its early developmental stages." The proposed letter also stated: "Unlike tier-one research universities undergraduate participation in research is more of a necessity at a teaching institution such as Miami." Dr. Lalvani emailed Dean Dollar about Dr. Thrash's proposed letter, seeking the Dean's guidance. Dr. Lalvani wrote that he found it "unusual" for a candidate to want to include a separate letter above and beyond his or her CV. Dean Dollar responded that candidates for tenure "are supposed to provide only their CV and copies of selected publications . . . . a letter from the candidate is absolutely not acceptable." Accordingly, Dr. Lalvani informed Dr. Thrash that he would not be permitted to use the letter.

Upon learning that his proposed letter would not be included in the material sent to his external reviewers, Dr. Thrash contacted the University's Office of Equity and Equal Opportunity (OEEO). Dr. Thrash indicated that he believed that Dr. Lalvani was putting forth an "extraordinary effort to complicate and disrupt the external review process" by not allowing him to use the letter in his materials. Ultimately, however, Dr. Thrash did not file a complaint through the OEEO.

Over the course of the next few months, letters from Dr. Thrash's external reviewers arrived. Four of the recommenders expressly recommended him for tenure. Of these, two offered substantive evaluations of Dr. Thrash's research and strongly endorsed him for tenure. Another noted that his area of research expertise differed from Dr. Thrash's and could not comment on the quality of Dr. Thrash's research, but endorsed him for tenure nonetheless. Another considered Dr. Thrash's

research quality to be good, but noted that Dr. Thrash's "record of scholarly productivity does not compare well with others in his field"; however, the reviewer attributed this to the fact that the University was not a "research-intensive universit[y]" and recommended Dr. Thrash for tenure.

Two of the reviewers did not make a tenure recommendation either way. Both of these reviewers offered substantive reviews of Dr. Thrash's research. One reviewer was positive, noting that he believed that Dr. Thrash would "continue to be a productive member of the research faculty" at the University. The other expressed "mixed opinions about the quality of Prof. Thrash's work"; specifically concluding that, although Dr. Thrash's publication record had been acceptable in terms of the number of papers accepted for publication, the reviewer still had "doubts about the quality and originality of the published work."

In October 2010, the department-level P&T committee recommended that Dr. Thrash be granted tenure. Dr. Lalvani disagreed with the department-level committee and recommended against granting Dr. Thrash tenure on the basis of his opinion that Dr. Thrash had not established a "robust research program" at the University. Dr. Thrash asked Dr. Lalvani to reconsider his decision, accusing Dr. Lalvani of having a "personal bias" against him. Dr. Lalvani again reviewed Dr. Thrash's dossier and supporting documents and declined to change his recommendation; he also disputed that he held any personal bias against Dr. Thrash.

Dean Dollar was the next level of review. According to Dean Dollar, when making his decision, he considered: Dr. Thrash's tenure dossier; external reference letters; the department-level committee's recommendation; Dr. Lalvani's letter recommending against tenure; Dr. Thrash's letter asking Dr. Lalvani to reconsider; Dr. Lalvani's response; and Dr. Thrash's second, third, fourth, and fifth year reviews. He also indicated that he had consulted with the School of Engineering and

Applied Sciences (SEAS) P&T committee,[1] which had "expressed concerns regarding the quality of [Dr. Thrash's] publications and questioned the prospect of continuation of [his] scholarly work." Dean Dollar agreed with Dr. Lalvani that the department-level P&T committee was wrong to recommend tenure, concluding "I do not believe that [Dr. Thrash's] record contains sufficient evidence of high quality research accomplishments." Dr. Thrash requested that Dean Dollar reconsider. Dean Dollar re-reviewed Dr. Thrash's application materials but did not change his recommendation.

The final level of review for Dr. Thrash was the University P&T committee, which relied on the "entire record as a whole" when concluding that Dr. Thrash should not be granted tenure. After the University P&T committee's decision, the decision to not grant Dr. Thrash tenure was final.

## II.

The district court granted summary judgment to the University on Dr. Thrash's claims that his adverse tenure decision violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. §§ 1981, 1983. We review de novo a district court's grant of summary judgment. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether the movant has met this burden, we view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir.2007). A dispute over a material fact is "genuine" if "a reasonable

---

[1]The SEAS committee is composed of the chairs of each department in the school.

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The district court also concluded that Dr. Lalvani was entitled to qualified immunity. "We review the denial of summary judgment on grounds of qualified immunity de novo because application of this doctrine is a question of law." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (internal citation omitted).

### III.

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e–2(a)(1). "In Title VII actions, a plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination" utilizing the framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (internal citation and quotation marks omitted). However, regardless of which approach is utilized, the "ultimate question" in employment discrimination cases is whether the plaintiff was the "victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 153 (2000).

The parties agree that the *McDonnell Douglas* framework applies here. Under that framework, the plaintiff "must carry the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination by his or her employer. . . . The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for the adverse employment

action. *DiCarlo*, 358 F.3d at 414 (internal citation and quotation marks omitted). Finally, if the employer carries its burden, the burden shifts back to the plaintiff to give him or her "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 414–15. Throughout the burden-shifting framework, however, "[t]he ultimate burden of persuasion remains at all times with the plaintiff." *Newman v. Federal Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001).

It is undisputed that Dr. Thrash established a prima facie case of racial discrimination and that defendants proffered a legitimate, nondiscriminatory reason for the decision to not extend a tenure offer to Dr. Thrash, namely, that his scholarship and research record was insufficient to warrant tenure. Accordingly, the dispute here—as is often the case—is over the third stage of the *McDonnell Douglas* framework: pretext. Regarding pretext, the Supreme Court has held:

> [A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . .

*Reeves*, 530 U.S. at 147. "[A] plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009).

Dr. Thrash attempts to demonstrate pretext in three ways. We conclude that he fails to meet his burden to show pretext in each instance.

A.

First, Dr. Thrash argues that the decision to not offer him tenure was pretextual because there is evidence that Dr. Lalvani "devalued African-American scholars generally, and Dr. Thrash specifically." We disagree.

Dr. Thrash argues that, in 2004 when he applied for the tenure-track position, Dr. Lalvani "viewed Dr. Thrash as an affirmative action hire who had received the job based not on his qualifications, but on his race." However, the evidence indicates that Dr. Lalvani believed that Dr. Thrash was qualified for the position and in fact wanted the University to hire him. Dr. Lalvani testified at his deposition that "[Dr. Thrash] had the qualifications" for the position, and that "[w]hen he interviewed, he came across as a viable candidate." At the time of Dr. Thrash's hire, Dr. Lalvani "enthusiastic[ally]" recommended that Dr. Thrash be hired. We cannot conclude merely from the fact that Dr. Thrash was hired as an "opportunity hire" that Dr. Lalvani harbored a negative view of either African-American scholarship or Dr. Thrash.

Dr. Thrash also argues that Dr. Lalvani's categorical rejection of external reviewers from HBCUs is evidence of Dr. Lalvani's racial bias against African-American scholarship. However, four of the six reviewers selected for the final list were Dr. Thrash's handpicked candidates. Four of the six reviewers selected for the final list were African-American. Moreover, per University policy, Dr. Lalvani, not Dr. Thrash, had final approval over which reviewers would be used, and Dr. Thrash understood that Dr. Lalvani had final approval over the list of reviewers. On this record, we do not conclude that a genuine issue of material fact exists regarding Dr. Lalvani's opinion of African-American scholarship where Dr. Lalvani approved a majority African-American list of reviewers.

On a related point, Dr. Thrash notes that Dr. Kerr, in her tenure and review process, had a reviewer from an HBCU, Norfolk State University, struck from her final list by Dr. Lalvani. Dr. Thrash argues that this is further evidence that Dr. Lalvani had a bias against HBCUs and African-American scholarship. However, Dr. Thrash ignores the fact that the recommender Dr. Lalvani struck was Chinese, not African-American. And, according to Dr. Kerr, Dr. Lalvani struck that reviewer not because the reviewer was from an HBCU, but because Norfolk State had no PhD program.

B.

Next, Dr. Thrash attempts to show pretext by arguing that "Dr. Lalvani treated him differently than his non-African[-]American colleagues who applied for tenure and promotion." Specifically, Dr. Thrash argues that fact questions persist regarding whether Drs. Kerr and Catherine Almquist, non-African-American professors in the Department, were treated more favorably by Dr. Lalvani during their tenure and review process. Again, we disagree.

1.

Dr. Thrash argues that Dr. Kerr was treated more favorably than he because she was granted tenure despite the fact that (1) Dr. Lalvani approved all but one of her reviewers, whereas he requested that Dr. Thrash provide two or three additional names; and (2) Dr. Lalvani permitted Dr. Kerr to use as a reviewer Dr. Coutts, with whom Dr. Kerr had worked in the past, whereas he rejected one of Dr. Thrash's proposed reviewers because the reviewer worked at the same institution as Dr. Thrash's wife. Dr. Thrash ignores the fact that the decision as to which reviewers appear on the final list was Dr. Lalvani's and Dean Dollar's, not his. According to University policy, the list of reviewers is to be developed "in consultation" with the candidate, but not by the candidate. There

is no evidence that Dr. Lalvani allowed Dr. Kerr to pick her own external reviewers.[2] And, Dr. Lalvani exercised the same type of supervisory authority over Dr. Kerr's list as over Dr. Thrash's, striking one of Dr. Kerr's reviewers because that reviewer was from a school without a PhD program. Indeed, we conclude that there is no factual dispute with regard to whether Dr. Lalvani applied the University's policy on reviewer selection consistently as to both Drs. Thrash and Kerr.

Similarly, the record reveals no question of fact regarding whether Drs. Thrash and Kerr were treated equally with regard to potential conflicts of interest among reviewers. Three of Dr. Thrash's reviewers knew him personally at the time they evaluated him for tenure. Each of these three reviewers was selected by Dr. Thrash on his original list of twelve reviewers and was approved by Dr. Lalvani for the final list. One reviewer wrote that she "[f]irst came to know Dr. Thrash when he participated in a National Science Foundation Minority Faculty Development Workshop that I directed in 2006. I have since followed his career through follow up activities related to the Workshop and activities of the Minority Faculty Forum of AIChE." Another reviewer wrote that he met Dr. Thrash in 2006 and had "occasional discussions" with him since then, although those encounters did not amount to very much interaction. Another reviewer wrote, "I have known Marvin for approximately 3 years, mainly from interactions at national meetings of the American Institute of Chemical Engineering." Just as Dr. Thrash had a relationship with some of his

---

[2]Dr. Thrash argues that *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988), where the plaintiff, a female tenure applicant, had been subject to sex discrimination, is dispositive on this point. We disagree because *Gutzwiller* is factually distinguishable. First, unlike here, where the decision about which reviewers to use is ultimately within the discretion of the department chair and dean, there, the department was required "to select at least three [reviewers] from the candidate's list." *Id.* at 1322. Second, in *Gutzwiller*, the department chair "diverg[ed] from the Department's published policy regarding outside evaluator selection" by selecting only two of the reviewers the plaintiff requested, whereas male applicants "routinely got all five of the evaluators they requested." *Id.* at 1326. By contrast, Dr. Lalvani appears to have conformed to the University's policy with regard to outside reviewers. Relatedly, unlike in *Gutzwiller*, when Dr. Thrash expressed concerns about the impartiality of a potential reviewer, Dr. Rorrer, Dr. Lalvani struck Dr. Rorrer from the list, even though he was not required to do so. *Id.*

reviewers, so too did Dr. Kerr have a relationship with one of hers: Dr. Coutts. Dr. Kerr testified that she met Dr. Coutts when she was a graduate intern and worked in the same institution as him and that she reported to his student, not to him. There is no evidence in the record that Dr. Kerr ever attempted to use a reviewer from the same institution as her spouse.

2.

Dr. Thrash argues that Dr. Almquist was treated more favorably than he because she was granted tenure despite the fact that Dr. Lalvani allowed her to write in her tenure dossier that she was forced to rely on undergraduate students in research because the University had no PhD program and only a few graduate students, whereas Dr. Lalvani criticized a similar statement in Dr. Thrash's dossier. However, Dr. Almquist's statements regarding her reliance on undergraduates in research were from her CV. By contrast, Dr. Thrash's statement that "[u]nlike at tier-one research universities undergraduate participation in research is more of a necessity at a teaching institution such as Miami" was not contained in his CV, but in the separate letter Dr. Thrash prepared and asked to be sent to his reviewers. Dean Dollar instructed that Dr. Thrash not be permitted to use the proposed letter because it was against policy for applicants to submit anything except a CV and copies of publications. There is no evidence that when Dr. Thrash drafted the proposed letter either Dean Dollar or Dr. Lalvani objected to any specific statement in it—the problem was the letter as a whole. Moreover, there is no evidence that Dr. Almquist ever sought to include a similar letter in her application materials. Indeed, there is no factual dispute whether Dr. Almquist and Dr. Thrash were treated the same with regard to which materials they were permitted to include in their dossiers: in each case, the tenure applicant was permitted to include his or her CV and publications, and nothing more.

We also disagree with Dr. Thrash that his statements were "strikingly similar" to Dr. Almquist's. Dr. Thrash wrote that he was forced to rely on undergraduate assistants because the University is not a "tier one research universit[y]." Months later, Dr. Lalvani wrote in his negative tenure recommendation that Dr. Thrash's characterization of the University "could lend an impression that research is not a high priority for tenure and promotion decisions," and it was "pejorative" and "misleading." By contrast, Dr. Almquist simply wrote that because the University did not have a PhD program and a limited Masters' program, she relied on undergraduates in research. Dr. Almquist did not comment on whether the University was a "tier one research university."

## C.

Finally, Dr. Thrash attempts to show pretext by arguing that there was "substantial evidence in the record that Dr. Thrash's scholarship was of sufficiently high quality to warrant a grant of tenure." We approach this argument cautiously, with an awareness "that it is not the function of the courts to sit as 'super-tenure' committees." *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 129 (1st Cir. 1991), *accord Doucet v. Univ. of Cincinnati*, No. 06-4118, slip op. at 5 (6th Cir. 2007). To the extent that, as here, a plaintiff's pretext argument would require courts to perform a substantive evaluation of his or her academic record, the courts face a significant challenge. We are neither engineers nor scientists, and as such are ill-suited to evaluate the quality of Dr. Thrash's work ourselves. To that end, this court has previously noted that "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally." *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545 (6th Cir. 1999) (internal citation and quotation marks omitted). Precisely for this reason, courts tend to hold that, although

academic tenure decisions are certainly "not . . . exempt from judicial scrutiny under Title VII," *Tanik v. S. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997) (per curiam), they are generally entitled to more deference than employment decisions in other settings. As the Seventh Circuit explained:

> [T]enure cases require something more than mere qualification; the department must believe the candidate has a certain amount of promise . . . . Given the nuanced nature of such decisions, we generally do not second-guess the expert decisions of faculty committees. . . . Accordingly, in the absence of clear discrimination, we are generally reluctant to review the merits of tenure decisions, recognizing that scholars are in the best position to make the highly subjective judgments related [to] the review of scholarship and university service.

*Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (internal citations and quotation marks omitted). Similarly, the Eighth Circuit has held that "in the tenure context . . . the plaintiff's evidence of pretext must be of such strength and quality as to permit a reasonable finding that the denial of tenure was obviously unsupported." *Kobrin v. Univ. of Minnesota,* 121 F.3d 408, 414 (8th Cir. 1997) (internal citation omitted); *see also Zahorik v. Cornell Univ.,* 729 F.3d 85, 93 (2d Cir. 1984) ("Courts . . . are understandably reluctant to review the merits of a tenure decision."); *Kumar v. Bd. of Tr., Univ. of Massachusetts*, 774 F.2d 1, 12 (1st Cir. 1985) ("Courts have no license to resolve [tenure] disputes except where there is evidence from which to conclude that an illicit motive was at work.").

With that in mind, we note that Dr. Thrash's peers on the department-level P&T committee (which did not include Dr. Lalvani, the purported epicenter of the alleged discrimination) expressed doubts about his research and scholarship during each of his first four years on campus. In each of Dr. Thrash's first four years, the committee returned consistent evaluations of Dr. Thrash. Each year, he received high marks in teaching and service, but the committee consistently questioned his

research. Although the committee's opinion of his scholarship became more positive in his fifth year, we cannot look only to the fifth-year review, particularly in light of the fact that the University's tenure policy looks not only at the candidate's existing scholarship, but to his or her "prospective continuation" of high-quality scholarship. To look solely to Dr. Thrash's fifth-year reviews to glean his peers' impression of his scholarship and its prospective continuation would be improper because it would ignore the overwhelming majority of his reviews.

Moreover, Dr. Thrash's external reviewers expressed mixed opinions about his scholarship. Only three of six evaluators expressly recommended Dr. Thrash for tenure after having reviewed his work. Another recommended Dr. Thrash for tenure, despite offering no review of his scholarship. Another made no recommendation as to tenure but expressed "doubts about the quality and originality of the published work."

In short, there was evidence on the record which calls into doubt whether Dr. Thrash's work was of sufficiently high quality to warrant tenure. Dr. Thrash's evidence of pretext as to the quality of his scholarship was not "of such strength and quality as to permit a reasonable finding that the denial of tenure was obviously unsupported." *Kobrin,* 121 F.3d at 414. On the contrary, the University's judgment on the issue of the quality of Dr. Thrash's scholarship was reasonable and supported by evidence. Under these facts and circumstances, we conclude that Dr. Thrash has not carried his burden of demonstrating that the University's tenure decision was pretextual.

IV.

Dr. Thrash's pretext arguments also focus on Dr. Lalvani's alleged discriminatory animus and conduct. However, Dr. Lalvani was not the ultimate decisionmaker—he did not have the

authority to hire or fire Dr. Thrash. Accordingly, Dr. Thrash argues that the University is liable for failing to grant him tenure under a "cat's paw" theory. We disagree.

The "cat's paw" theory of liability, in the employment discrimination context, "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006), *accord Davis v. Omni-Care, Inc.*, 482 F. App'x 102, 109 (6th Cir. 2012). In cases where intermediate supervisors harbor an impermissible bias, "it is proper to impute their discriminatory attitudes to the formal decisionmaker" even if the formal decisionmaker did not harbor such attitudes. *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 477 (5th Cir. 2005) (internal citations omitted), *accord Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012). In 2011, the Supreme Court elaborated on the contours of a cat's paw claim in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011). There, the Court held that "if a supervisor performs an act motivated by animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Id.* at 1194. With regard to causation, the Court held that "it is common for injuries to have multiple proximate causes," and, therefore, the mere fact that a decisionmaker conducts a *post hoc* investigation into its decision does not *per se* absolve it of liability, particularly if the investigation "relies on facts provided by the biased supervisor." *Id.* at 1192–93.

Dr. Thrash argues that because every level of review above Dr. Lalvani relied to some degree on Dr. Lalvani's negative tenure recommendation, Dr. Lalvani's actions were a proximate cause of the ultimate decision against tenure and that he is therefore entitled to relief under *Staub*. However,

*Staub* made clear that a plaintiff must show both proximate cause and discriminatory intent to prevail. Even assuming that Dr. Thrash could show that Dr. Lalvani's actions were a proximate cause of the ultimate tenure decision, Dr. Thrash has failed to show that Dr. Lalvani's actions were pretextual. Accordingly, it is improper to impute Dr. Lalvani's alleged discriminatory attitude to the University where Dr. Thrash has failed to create a fact question regarding Dr. Lalvani's discriminatory attitude in the first instance. *Bryant*, 413 F.3d at 477. Having failed to establish a necessary element of a cat's paw claim, Dr. Thrash's argument fails on its own terms.

## V.

For the foregoing reasons, we conclude that Dr. Thrash has failed to establish a genuine issue of material fact as to the "ultimate question" in this case, namely, whether he was the "victim of intentional discrimination." *Reeves*, 530 U.S. at 153. Accordingly, we affirm the judgment of the district court.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The Supreme Court has repeatedly stated that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (internal quotation marks omitted). Yet, the majority has made credibility determinations, weighed the evidence, and drawn inferences to conclude that Dr. Marvin Thrash was not discriminated against on account of his race in his application for tenure at Miami University (the "University").[3] Because this case presents a genuine dispute over whether the stated reason for tenure denial is merely a pretext, I must respectfully dissent.

In this case, the parties primarily dispute whether the reason offered for the denial of tenure to Dr. Thrash was pretext for racial discrimination. *See* Maj. Op. at 11. In laying out the legal standard it will apply, the majority misrepresents *Reeves v. Sanderson Plumbing, Inc.*:

Regarding pretext, the Supreme Court has held:

> "[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . ."

---

[3] The overuse of summary judgment has been criticized not only by civil procedure scholars, *see, e.g.*, Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. REV. 982, 1134 (2003) (stating that "[t]aking decisionmaking authority from juries runs counter to basic and long-cherished principles of our system"), but also by thoughtful judges, *see, e.g.*, *In re One Star Class Sloop Sailboat Built in 1930 with Hull No. 721, Named "Flash II,"* 517 F. Supp. 2d 546, 555 (D. Mass. 2007) (noting that commentators are in near unanimous agreement that federal courts overuse summary judgment as a case management tool); Mark W. Bennett, *Essay: From the "No Spittin', No Cussin' and No Summary Judgment" Days of Employment Discrimination Litigation to the "Defendant's Summary Judgment Affirmed Without Comment" Days: One Judge's Four-Decade Perspective*, 57 N.Y.L. Sch. L. Rev. 685 (2013); Patricia M. Wald, *Summary Judgment at Sixty*, 76 TEX. L. REV. 1897, 1935 (1998).

*Reeves*, 530 U.S. at 14[8].

*Id.* This statement is not the *holding* of *Reeves*. Instead, as a concurrence in *Reeves* pointed out, "[t]he Court today holds that an employment discrimination plaintiff *may* survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a 'prima facie case,' . . . and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false." *Id.* at 154 (Ginsburg, J., concurring);[4] *see also id.* at 148 (majority opinion) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

The majority's troubling view that judges can grant summary judgment "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue" is even more problematic because there is no "abundant and uncontroverted independent evidence that no discrimination occurred" in this case as the Supreme Court *dicta* required. Moreover, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151 (majority opinion).

In adjudicating Dr. Thrash's case, the majority does not "give credence to the evidence favoring [him]." *Id.* The majority does not disregard contested evidence favorable to the University. The majority does not draw all reasonable inferences in Dr. Thrash's favor. Instead, the majority makes credibility determinations in order to accept the University's evidence. It also weighs this evidence against evidence submitted by Dr. Thrash to determine that a reasonable jury

---

[4] The concurrence also provides that "circumstances in which plaintiffs will be required to submit evidence beyond these two categories . . . will be uncommon." *Id.* The *Reeves* majority acknowledges that its discussion is *dicta*. *See id.* at 149 (noting that "[f]or purposes of this case, we need not—and could not—resolve all of the circumstances in which such factors would entitle an employer to judgment . . . .").

would side with the University.  Finally, the majority simply ignores reasonable inferences that a jury could draw.

Dr. Thrash's theory of the case is that his scholarship was strong enough to warrant tenure, but that the chair of his department, Dr. Lalvani, by devaluing African-American scholarship generally, and Dr. Thrash specifically, was principally responsible for the University's conclusion that the scholarship was deficient.  Dr. Thrash hoped to prove to a jury that his scholarship was sufficient and that Dr. Lalvani's racial bias was the reason why Dr. Lalvani concluded (and convinced others) that the scholarship was deficient.  Thus, each portion of Dr. Thrash's argument should not be viewed in isolation.  But this is precisely what the majority does.

For example, Dr. Thrash suggests that Dr. Lalvani viewed him differently from the start because he was hired as part of an affirmative-action program at the University.  The majority isolates this fact and states "[w]e cannot conclude merely from the fact that Dr. Thrash was hired as an 'opportunity hire' that Dr. Lalvani harbored a negative view of either African-American scholarship or Dr. Thrash." Maj. Op. at 12.[5]  The majority reached this conclusion by comparing the circumstances of the hiring with Dr. Lalvani's testimony and statements that he wanted Dr. Thrash hired. *Id.*  By crediting this testimony, the majority makes a credibility finding.  A jury, however, is entitled to disbelieve this testimony by Dr. Lalvani that he wanted Dr. Thrash hired.  Moreover, a jury is entitled to make reasonable inferences.  For example, it could infer that while Dr. Lalvani did want another member added to his department—especially a member whose salary

---

[5]The majority was not asked to draw that conclusion merely from one piece of evidence.  Where there is no smoking-gun proof of discrimination, no single piece of evidence typically shows discrimination.  Instead, jurors, not judges, have to piece together the puzzle from multiple pieces.

he did not have to pay out of his limited department budget—he still viewed Dr. Thrash as inferior to regular hires.

Other evidence of bias includes Dr. Lalvani's statement that he would not accept any reviewer from a historically black college or university ("HBCU").[6] Rather than recognize this as evidence of racial bias,[7] the majority again usurps the jury's role and weighs this evidence, in isolation, against other evidence it views as relevant. The majority compares the exclusion of all reviewers from HBCUs, evidence suggesting racial bias, with another piece of evidence that suggests no racial bias—that the majority of reviewers ended up being African Americans–and concludes that no "genuine issue of material fact exists regarding Dr. Lalvani's opinion of African-American scholarship where Dr. Lalvani approved a majority African-American list of reviewers." Maj. Op. at 13.

Dr. Thrash hoped to prove to a jury that the University's conclusion that his scholarship was insufficient was based purely on Dr. Lalvani's bias. The majority ignores the interconnected nature of the argument. Instead, the majority evaluates Dr. Thrash's scholarship in isolation. By doing so, the majority flips the burden. Rather than requiring Dr. Thrash to proffer some evidence that the stated reason for the denial of tenure—that his scholarship was subpar—has no basis in fact, *see Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009), the majority establishes that

---

[6] The majority notes in its fact section that Dr. Lalvani denies stating that he would not accept reviewers from HBCUs. Maj. Op. at 5. However, Dr. Lalvani's actions are consistent with this statement. If the jury believes that Dr. Lalvani made this statement, they could also view this denial by him as probative of an intent to conceal bias.

[7] The categorical labeling of all HBCU professors (no matter their race) as unqualified to provide reviews is without a doubt evidence of bias against African-American scholarship and African Americans in general. Imagine if Dr. Lalvani categorically rejected any professor, whether male or female, from colleges and universities that had in the past served only female students. One could certainly conclude that viewing the entire faculties of such schools as unqualified because they once taught only women suggests bias against women.

it should grant the motion for summary judgment as long as there is some evidence "which calls into doubt whether Dr. Thrash's work was of sufficiently high quality to warrant tenure." Maj. Op. at 19. The majority's standard appears to be that in tenure denials, the applicant must prove that there was no doubt that his work was worthy of tenure.

It is not hard to see why Dr. Thrash singled out Dr. Lalvani as the cause of the denial of his tenure application. Dr. Lalvani's exclusion of HBCU reviewers is troubling. Moreover, Dr. Thrash's prospects for tenure appear to be derailed at precisely the moment when Dr. Lalvani reviews Dr. Thrash's scholarship. Significantly, many of the individuals who reviewed Dr. Thrash's scholarly record after his fifth year and before the injection of Dr. Lalvani's negative opinion deemed Dr. Thrash's record sufficient to warrant tenure. Dr. Thrash's fifth-year review gave him high marks in teaching, *scholarship*, and service.[8] Dean Dollar, the dean of the University's School of Engineering and Applied Sciences, concluded at this point that in his research Dr. Thrash was making good progress toward achieving tenure and told Dr. Thrash to apply for tenure that year rather than continuing to build his record. Similarly, the outside reviewers submitted evaluations of Dr. Thrash's scholarly record that ranged from lukewarm (Forciniti) to positive (Pishko, Palmer) to enthusiastic (Ofoli, Barabino, Thompson). Members of Dr. Thrash's department deemed that his research was adequate for tenure. Thus, Dr. Thrash presents a substantial amount of evidence that, before he was reviewed by Dr. Lalvani, the view of his research record including by members of his department, by outside reviewers, and by Dean Dollar was that it was sufficient to warrant tenure.

---

[8]The majority relies on earlier reviews that found Dr. Thrash's scholarship to be lacking. *See* Maj. Op. at 18. The majority refuses to "look only to the fifth-year review," *id.*, but ignores the fact that each review is comparing the candidate to peers at the same career point. Thus, the fifth-year review does not suggest merely that Dr. Thrash performed well during his fifth year, but that as a fifth-year, tenure-track professor he is "making progress towards promotion and tenure." R. 22-3 (Thrash dep. ex. 31) (Page ID #1011).

That assessment changes starkly after Dr. Lalvani's review. Dr. Lalvani uniquely concluded that Dr. Thrash's research record was insufficient. This assessment was then presented to every subsequent reviewer. Each subsequent reviewer, acknowledging that they greatly value the opinion of the department chair, Dr. Lalvani, then similarly concluded that Dr. Thrash's scholarship was insufficient. Whether Dr. Thrash's scholarship was sufficient to warrant tenure remains an open issue that must be considered by a jury in combination with evidence of Dr. Lalvani's bias.

To prevail, Dr. Thrash must show that although Dr. Lalvani was not the decisionmaker, his act of failing to recommend Dr. Thrash for tenure, motivated by his animus, was a proximate cause of the denial of tenure. I conclude that there is certainly enough evidence from which a jury could decide that Dr. Lalvani's failure to recommend proximately caused the denial of tenure.

Too often, particularly in employment discrimination cases, judges decide for themselves what evidence juries will or will not believe or how they will weigh this evidence. Because a jury, not a judge, should determine whether evidence suggestive of bias proves bias, I respectfully dissent.